# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

**January 2020 Term**

_____

**No. 19-0298**

_____

**FILED**
**April 21, 2020**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**PATRICK MORRISEY, WEST VIRGINIA ATTORNEY GENERAL,
AND THE STATE OF WEST VIRGINIA,**
**Defendants Below, Petitioners**

**V.**

**WEST VIRGINIA AFL-CIO;
WEST VIRGINIA STATE BUILDING AND
CONSTRUCTION TRADES COUNCIL, AFL-CIO;
UNITED MINE WORKERS OF AMERICA, AFL-CIO;
CHAFFEURS, TEAMSTERS, AND HELPERS, LOCAL NO. 175;
AMANDA GAINES; AND
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,
AFL-CIO, LOCALS 141, 307, 317, 466, 596, AND 968,**
**Plaintiffs Below, Respondents**

_____

**Appeal from the Circuit Court of Kanawha County
The Honorable Jennifer F. Bailey, Judge
Civil Action Nos. 16-C-959 and 16-C-969**

**REVERSED AND REMANDED**

_____

**Submitted: January 15, 2020
Filed: April 21, 2020**

Patrick Morrisey
Attorney General
Lindsay S. See
Solicitor General
Charleston, West Virginia
Attorneys for the Petitioners

Vincent Trivelli
The Law Office of Vincent Trivelli
Robert M. Bastress
Morgantown, West Virginia
Attorneys for the Respondents

Mark H. Dellinger
Justin M. Harrison
Danielle M. Waltz
Benjamin J. Wilson
Jackson Kelly PLLC
Charleston, West Virginia
Attorneys for Amicus Curiae,
Associated Builders and
Contractors, Inc., West Virginia
Chapter

Elbert Lin
Hunton Andrews Kurth LLP
Richmond, Virginia
Attorney for Amicus Curiae,
The Chamber of Commerce of the
United States of America

Matthew B. Gilliam
Springfield, Virginia
Attorney for Amici Curiae,
Donna Harper and
The National Right to Work Legal
Defense Foundation, Inc.

Richard R. Heath, Jr.
Bowles Rice, LLP
Charleston, West Virginia
Attorney for Amici Curiae,
The Cardinal Institute for West
Virginia Policy and
Americans for Prosperity

Derk A. Wilcox
Mackinac Center for Public Policy
Mackinac Center Legal Foundation
Midland, Michigan
J. Mark Adkins
Bowles Rice, LLP
Charleston, West Virginia
Attorneys for Amicus Curiae,
The Mackinac Center for Public
Policy

Loree Stark
American Civil Liberties Union of
West Virginia Foundation
Charleston, West Virginia
Attorney for Amicus Curiae,
American Civil Liberties Union of
West Virginia Foundation

Samuel B. Petsonk
Beckley, West Virginia
Attorney for Amicus Curiae,
The West Virginia Employment
Lawyers Association

**Mark A. Carter**
**Clayton T. Harkins**
**Dinsmore & Shohl LLP**
**Charleston, West Virginia**
**Attorneys for Amici Curiae,**
**The West Virginia Chamber of**
**Commerce and**
**The West Virginia Manufacturers**
**Association**

**JUSTICE JENKINS delivered the Opinion of the Court.**

**CHIEF JUSTICE ARMSTEAD, deeming himself disqualified, did not participate in the decision of this case.**

**JUDGE GREGORY L. HOWARD, JR., sitting by temporary assignment.**

**JUSTICE WORKMAN concurs in part and dissents in part and reserves the right to file a separate opinion.**

**JUSTICE HUTCHISON concurs and reserves the right to file a concurring opinion.**

**SYLLABUS BY THE COURT**

1.	The provisions of West Virginia Code sections 21-1A-3 (2019) and 21-5G-2 (2019) that prohibit requiring a person, as a condition of employment or as a condition for the continuation of employment, to pay any dues, fees, assessments, or other similar charges to a labor organization do not violate any right of association under article III, sections 7 and 16 of the West Virginia Constitution.

2.	The provisions of West Virginia Code sections 21-1A-3 (2019) and 21-5G-2 (2019) that prohibit requiring a person, as a condition of employment or as a condition for the continuation of employment, to pay any dues, fees, assessments, or other similar charges to a labor organization do not result in an unconstitutional taking and do not violate article III, section 9 of the West Virginia Constitution.

3.	The provisions of West Virginia Code sections 21-1A-3 (2019) and 21-5G-2 (2019) that prohibit requiring a person, as a condition of employment or as a condition for the continuation of employment, to pay any dues, fees, assessments, or other similar charges to a labor organization do not infringe upon any liberty interest under article III, sections 3 and 10 of the West Virginia Constitution.

**Jenkins, Justice:**

In 2016, the West Virginia Legislature enacted the Workplace Freedom Act (sometimes "the Act"),[1] making West Virginia the nation's twenty-sixth right-to-work state.[2] For a second time, we consider the constitutionality of the Act, which prohibits collective bargaining agreements that require an employee to pay any dues, fees, assessments, or other similar charges as a condition of employment, or as a condition for the continuation of employment, when the employee has chosen not to join a union. In *Morrisey v. West Virginia AFL-CIO* (*Morrisey I*),[3] we rejected the arguments made here in the context of a preliminary injunction and remanded the case for a final hearing.

On remand and in the absence of any additional evidence or arguments, the Circuit Court of Kanawha County ruled that the Act unconstitutionally infringes upon the rights of the plaintiffs below, primarily labor unions that are member organizations of the AFL-CIO[4] ("Labor Unions") who represent both private and government workers in West Virginia. So, Attorney General, Patrick Morrisey, and the State of West Virginia

---

[1] West Virginia Code §§ 21-5G-1 to -7.

[2] Kentucky enacted right-to-work legislation in 2017, thus bringing the total number of right-to-work states up to twenty-seven.

[3] 239 W. Va. 633, 804 S.E.2d 883 (2017).

[4] The AFL-CIO describes itself as a federation of labor organizations whose member organizations represent employees of employers in both the private and public sectors in the State of West Virginia.

(collectively, "the State"), appeal the circuit court's summary judgment order finding that the Act infringes upon the Labor Unions' rights to associate, as well as their liberty and property rights.

We conclude that the Act does not violate constitutional rights of association, property, or liberty. Therefore, we reverse the circuit court's contrary rulings and remand this case for summary judgment in favor of the State consistent with this decision.[5]

## I.

## FACTUAL AND PROCEDURAL HISTORY

To better understand the issues in this case, we begin by discussing the relevant federal labor statutes. We then summarize the history of West Virginia labor laws leading up to and including the provision currently under scrutiny. Finally, we review the procedural facts leading to this appeal.

---

[5] We express our appreciation for the contributions to our consideration of this important case of the numerous Amici Curiae who submitted briefs in this matter. The following Amici Curiae filed briefs in support of the State: The Chamber of Commerce of the United States of America; Donna Harper and the National Right to Work Legal Defense Foundation, Inc.; the Cardinal Institute for West Virginia Policy; Americans for Prosperity; the Mackinac Center for Public Policy; the West Virginia Chamber of Commerce; and the West Virginia Manufacturers Association. In addition, Amici Curiae, the American Civil Liberties Union of West Virginia Foundation and the West Virginia Employment Lawyers Association, filed briefs supporting the Labor Unions.

2

### A. Relevant Federal Labor Law

In 1935, Congress enacted the National Labor Relations Act, also known as the Wagner Act ("NLRA").[6] "[T]he conception of the Wagner Act was deeply rooted in labor's long struggle for the right to organize and bargain collectively." *The Wagner Act: After Ten Years* 5 (Louis G. Silverberg ed., The Bureau of Nat'l Affairs, Inc. 1945). It has been described as an effort to reverse "years of misuse of the injunction in labor disputes and the distortion of the anti-trust laws into anti-labor weapons." *Id.* The NLRA was legislation enacted "to encourage collective bargaining." *Morrisey I.*[7]

Over the next twelve years new concerns arose that the balance of power had shifted too far in the direction of organized labor. In an effort to restore some measure of equilibrium, the NLRA was amended in 1947 through the passage of the Taft-Hartley Act, which also re-designated chapter 7 of title 29 as the "Labor Management Relations Act of 1947" ("LMRA").[8] A sponsor of the LMRA, has explained that,

> [o]riginally the employer had had all of the advantages over his employees. He could deal with them one at a time and refuse to recognize the union. He could stand a strike in most cases better than they could. The courts would freely grant

---

[6] *See* National Labor Relations (Wagner) Act, ch. 372, 49 Stat. 449 (1935) (codified as amended at 29 U.S.C. §§ 151 to 169 (2012)).

[7] 239 W. Va. at 639, 804 S.E.2d at 889. *See also* National Labor Relations (Wagner) Act, ch. 372, 49 Stat. 449 (1935) (codified as amended at 29 U.S.C. §§ 151 to 169 (2012) (stating the purpose of the 1935 NLRA as, among other things, "to diminish the causes of labor disputes burdening or obstructing interstate and foreign commerce[.]").

[8] *See* 29 U.S.C. § 141(a) (stating that chapter 7 may be cited as the "'Labor Management Relations Act, 1947'").

injunctions against any effective action by the unions. This unfair situation resulted in the enactment of the Clayton Act, the Norris-LaGuardia Act, and the Wagner Act. These laws, together with the consistently pro-labor attitude of the Executive, pro-labor interpretations, and pro-labor administration, more than redressed the balance, so that by 1946 employers, except for the largest concerns, were practically at the mercy of labor unions. As a practical matter, no legal remedy remained to the employer, the public, or even to the individual labor union member, against the acts of labor union leaders no matter how violent or arbitrary they might be.

The Taft-Hartley Law was an attempt to restore some equality between employer and employee so that there might be free collective bargaining. There can be no such bargaining if one party feels that the government and the courts will back up whatever unreasonable demand he may make. But it was equally important not to swing the pendulum back so far as to give the employer again an undue advantage. . . .

The Senate Committee felt that our job was one of correcting inequalities in existing law[.] . . .

Robert A. Taft, *Forward to* Fred A. Hartley, Jr., *Our New National Labor Policy*, *The Taft-Hartley Act and the Next Steps*, at xii (1948).

The Taft-Hartley Act made major changes to the NLRA. Several provisions of the resulting LMRA are significant to our resolution of this appeal. In particular, through the LMRA, Congress "prohibited a 'closed shop,' a union security agreement[9] whereby

---

[9] "A 'union security agreement' is an agreement between a union and an employer that the employer will require all employees to undertake a specified level of support for the union as a condition of employment. R. Gorman, Labor Law 639 (1976)." Kenneth G. Dau-Schmidt, *Union Security Agreements Under the National Labor Relations Act: The Statute, the Constitution, and the Court's Opinion in Beck*, 27 Harv. J. on Legis. 51, 51 n.2 (1990).

4

an employer agrees to employ only union members." *Morrisey I.*[10]  Instead, the LMRA

"permits an employer and an exclusive bargaining representative to enter into an agreement

requiring all employees in the bargaining unit to pay periodic union dues and initiation fees

as a condition of continued employment, whether or not the employees otherwise wish to

become union members." *Commc'ns Workers of Am. v. Beck.*[11]

> designated or selected for the purposes of collective bargaining
> by the majority of the employees in a unit appropriate for such
> purposes, shall be the exclusive representatives of all the
> employees in such unit for the purposes of collective
> bargaining in respect to rates of pay, wages, hours of
> employment, or other conditions of employment.

29 U.S.C. § 159(a) (2012).  Following this scheme,

> the union is empowered to bargain collectively with the
> employer on behalf of all employees in the bargaining unit over
> wages, hours, and other terms and conditions of employment,
> § 9(a), 29 U.S.C. § 159(a), and it accordingly enjoys "broad
> authority . . . in the negotiation and administration of [the]
> collective bargaining contract." *Humphrey v. Moore*, 375 U.S.

The term "exclusive bargaining representative" refers to a labor organization

that has met certain criteria.  Under the LMRA, representatives

---

[10] 239 W. Va. at 639, 804 S.E.2d at 889.

[11]  487 U.S. 735, 738, 108 S. Ct. 2641, 2645, 101 L. Ed. 2d 634 (1988)
(emphasis added).  *See also* 29 U.S.C. § 158(a)(3) (2012) (stating, in part, that "nothing in
this subchapter, or in any other statute of the United States, shall preclude an employer
from making an agreement with a labor organization (not established, maintained, or
assisted by any action defined in this subsection as an unfair labor practice) to require as a
condition of employment membership therein on or after the thirtieth day following the
beginning of such employment or the effective date of such agreement, whichever is the
later, (i) if such labor organization is the representative of the employees as provided in
section 159(a) of this title . . . .").

5

> 335, 342, 84 S. Ct. 363, 367, 11 L. Ed. 2d 370 (1964). This broad authority, however, is tempered by the union's "statutory obligation to serve the interests of all members without hostility or discrimination toward any," *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S. Ct. 903, 910, 17 L. Ed. 2d 842 (1967), a duty that extends not only to the negotiation of the collective-bargaining agreement itself but also to the subsequent enforcement of that agreement, including the administration of any grievance procedure the agreement may establish. *Ibid*.

*Beck*.[12] Under the LMRA then, a labor organization designated as the exclusive bargaining representative is permitted to enter into an agreement with an employer that allows it to collect certain union dues and initiation fees from all employees of the bargaining unit as a condition of their continued employment, regardless of whether the employees choose to become members of the labor organization.[13] Additionally, an exclusive bargaining representative is empowered to bargain with the employer on behalf of all employees in a bargaining unit and owes a corresponding duty to provide representation, without hostility or discrimination, to all bargaining unit employees.[14] A labor organization that has not achieved exclusive bargaining representation status does not receive these benefits or owe the corresponding obligations.

---

[12] 487 U.S. at 739, 108 S. Ct. at 2645, 101 L. Ed. 2d 634.

[13] *See* 29 U.S.C. § 158(a)(3).

[14] *See* 29 U.S.C. § 159(a).

Importantly, however, the LMRA expressly preserves the freedom of states to enact laws that prohibit agreements requiring membership in a labor organization as a condition of employment:

> (b) Agreements requiring union membership in violation of State law
>
> Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

29 U.S.C. § 164(b) (2012).[15]  Stated otherwise, "under federal law, states may decide whether to allow or prohibit employers and unions to negotiate agreements requiring compulsory union membership, or requiring nonunion employees to pay dues or fees to the union." *Morrisey I*.[16]  Having reviewed this background, we next look to the development of the relevant labor law in West Virginia.

---

[15] *See Morrisey I*, 239 W. Va. at 639, 804 S.E.2d at 889 ("The United States Supreme Court has examined the interplay between [29 U.S.C. § 158(a)(3)] and [29 U.S.C. § 164(b)] and found that 'Congress left the States free to legislate' and adopt laws 'restricting the execution and enforcement of union-security agreements,' and even free to go so far as to 'outlaw' a union-security arrangement." (quoting *Retail Clerks Int'l Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 102-03, 84 S. Ct. 219, 222, 11 L. Ed. 2d 179 (1963))).

[16] 239 W. Va. at 640, 804 S.E.2d at 890.

## B. Relevant West Virginia Labor Law

In 1965, the West Virginia Legislature enacted a two-section article addressing labor-management relations.[17] The primary purpose of the article was the prevention or prompt resolution of labor disputes.[18] In furtherance of this goal, the Commissioner of Labor was empowered to "investigate and mediate" certain labor disputes. W. Va. Code § 21-1A-2.

Thereafter, in 1971, the "Labor-Management Relations Act for the Private Sector" ("1971 Labor-Management Relations Act") was enacted to replace the 1965 article.[19] The 1971 Labor-Management Relations Act was "patterned after the provisions of the 'National Labor Relations Act.'" W. Va. Code § 21-1A-1(c) (Michie 1973).[20] The declared purposes of the 1971 Labor-Management Relations Act, which remain the same

---

[17] *See* W. Va. Code §§ 21-1A-1 and -2 (Michie Supp. 1965).

[18] *See* W. Va. Code § 21-1A-1 (stating, in part, that "[i]t is hereby declared as the public policy of this State that the best interests of the people of the State are served by the prevention or prompt settlement of labor disputes . . . .").

[19] *See* W. Va. Code §§ 21-1A-1 to -8 (Michie 1973).

[20] *See also United Steelworkers of Am., AFL-CIO, CLC v. Tri-State Greyhound Park*, 178 W. Va. 729, 731, 364 S.E.2d 257, 259 (1987) ("In 1971, the Legislature enacted the West Virginia Labor-Management Relations Act for the Private Sector to supplement the federal act in areas such as those left by jurisdictional abstention on the part of the NLRB. 1971 W. Va. Acts ch. 82. Its provisions are patterned after the federal act, including in the creation of a labor relations board to promote and protect the rights granted thereunder.").

today, are to encourage collective bargaining and to protect the rights of employees to organize for purposes of such bargaining:

> It is hereby declared to be the public policy of this State and the purposes of this article to encourage the practice and procedure of collective bargaining by protecting the exercise by employees of full freedom of association, self-organization and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection; to prescribe the legitimate rights of both employees and employers in their relations; to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other; to protect the rights of individual employees in their relations with labor organizations; to define and prescribe practices on the part of labor and management which are inimical to the welfare, prosperity, health and peace of the people of this State; and to protect the rights of the public in connection with labor disputes. . . .

W. Va. Code § 21-1A-1(a) (Michie 1973).[21] Notably, the 1971 Labor-Management Relations Act contained a provision titled "Rights of employees," under which it was recognized that employees could be subject to an agreement requiring their membership in a labor organization as a condition of their employment:

> Employees shall have the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in subdivision (3), subsection (a), section 4 [§ 21-1A-4] of this article.

---

[21] *See also* W. Va. Code § 21-1A-1(a) (LexisNexis 2019).

W. Va. Code § 21-1A-3 (Michie 1973). The provision referred to in West Virginia Code section 21-1A-3, *i.e.*, West Virginia Code section 21-1A-4, is titled "Unfair labor practices," and it contained a provision similar to that of the LMRA that allowed an employer and labor organization to execute an agreement, referred to above as a "union security agreement,"[22] that compelled employees, as a condition of employment, to become members of the labor organization after a certain period of time had lapsed and other conditions had been met:

> (a) It shall be an unfair labor practice for an employer:
>
> . . . .
>
> (3)  By discrimination in regard to hire or tenure of employment or any term or condition of employment, to encourage or discourage membership in any labor organization:  *provided*, however, that nothing contained in this article, or in any other statute of this State, *shall preclude an employer from making an agreement with a labor organization* (not established, maintained or assisted by any action defined in this section as an unfair labor practice) *to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later* . . . .

W. Va. Code § 21-1A-4(a)(3) (Michie 1973) (some emphasis added).[23]

---

[22] *See supra* note 9 for the definition of a "union security agreement."

[23] The additional conditions contained in West Virginia Code section 21-1A-4(a)(3) (Michie 1973) are in accordance with the LMRA and require the labor organization to have been certified as the exclusive representative of the bargaining unit and that the bargaining unit employees have not voted to rescind the authority of the labor organization.

Then, in 2016, the Legislature exercised the authority expressly granted under the LMRA[24] and enacted Senate Bill 1 ("S.B. 1"). S.B. 1 amended two sections of the 1971 Labor-Management Relations Act, West Virginia Code sections 21-1A-3 and -4, and also added a new article to Chapter 21 of the West Virginia Code, designated as article 5G, which is the Workplace Freedom Act.[25]

Most notably, while the amended version of West Virginia Code section 21-1A-3, the "Rights of employees" section, continues to protect the rights of employees to voluntarily organize, the statute no longer allows workers to be required, as a condition of their employment, to associate with, or pay dues to, a labor organization:

> Employees shall have the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities, including the right to refrain from paying any dues, fees, assessments or other similar charges however denominated of any kind or amount to a labor organization or to any third party including, but not limited to, a charity in lieu of a payment to a labor organization.

W. Va. Code § 21-1A-3 (LexisNexis 2019). The amendment to West Virginia Code section 21-1A-4 likewise eliminated the authorization of "union security agreements" in

---

[24] *See* 29 U.S.C. § 164(b) (2012).

[25] *See* S.B. 1, 82nd Leg., Reg. Sess. (W. Va. 2016); Vol. 1, 2016 W. Va. Acts 1096.

West Virginia. W. Va. Code § 21-1A-4(a)(3) (LexisNexis 2019).[26] Finally, S.B. 1 created the Act, which is codified at West Virginia Code sections 21-5G-1 to -7. The Act vests workers with the right to choose for themselves whether they will become a member of a labor organization, rather than having that choice imposed upon them by virtue of an agreement between their employer and a labor organization:

> A person may not be required, as a condition or continuation of employment, to:
>
> (1) Become or remain a member of a labor organization;
>
> (2) Pay any dues, fees, assessments or other similar charges, however denominated, of any kind or amount to any labor organization; or
>
> (3) Pay any charity or third party, in lieu of those payments, any amount that is equivalent to or a pro rata portion of dues, fees, assessments or other charges required of members of a labor organization.

W. Va. Code § 21-5G-2 (LexisNexis 2019). In addition, the Act: (1) makes unlawful and nullifies any agreement that excludes any person from employment due to their association with, or lack of association with, any labor organization;[27] (2) imposes a criminal penalty

---

[26] This paragraph states that "(a) it shall be an unfair labor practice for an employer: . . . (3) By discrimination in regard to hire or tenure of employment or any term or condition of employment, to encourage or discourage membership in any labor organization[.]" W. Va. Code § 21-1A-4(a)(3) (LexisNexis 2019).

[27] See W. Va. Code § 21-5G-3 (LexisNexis 2019), which provides that

> [a]ny agreement, contract, understanding or practice, either written or oral, implied or expressed, between any labor organization and an employer or public body which provides for the exclusion from employment of any person because of membership in, affiliation with, resignation from, or refusal to

for violation of West Virginia Code section 21-5G-2;[28] and (3) allows for civil relief to anyone who has been injured by a violation of West Virginia Code section 21-5G-2.[29] The Act was to become effective on May 4, 2016; however, its application was prospective:

> This article applies to any written or oral contract or agreement entered into, modified, renewed or extended on or after July 1, 2016: *Provided*, That the provisions of this article do not otherwise apply to or abrogate a written or oral contract or agreement in effect on or before June 30, 2016.

---

join or affiliate with any labor organization or employee organization of any kind is hereby declared to be unlawful, null and void, and of no legal effect.

[28] *See* W. Va. Code § 21-5G-4 (LexisNexis 2019), directing that "[a]ny person who knowingly requires another person, as a condition or continuation of employment, to perform any of the conduct enumerated in section two of this article, is guilty of a misdemeanor and, upon conviction thereof, shall be fined not less than $500 nor more than $5,000."

[29] *See* W. Va. Code § 21-5G-5 (LexisNexis 2019), under which

> [a]ny person injured as a result of any violation or threatened violation of this article shall have a cause of action, and, if proven in a court of competent jurisdiction, may be entitled to the following relief against a person or persons violating or threatening to violate this article:
>
> (1) Compensatory damages;
>
> (2) Costs and reasonable attorney fees, which shall be awarded if the injured person substantially prevails;
>
> (3) Punitive damages in accordance with the provisions of section twenty-nine [§ 55-7-29], article seven, chapter fifty-five of this code;
>
> (4) Preliminary and permanent injunctive relief; and
>
> (5) Any other appropriate equitable relief.

W. Va. Code § 21-5G-7 (LexisNexis 2019).

From this point forward, when we refer to the Workplace Freedom Act or the Act, we include in that reference West Virginia Code sections 21-1A-3 and -4, as amended by S.B. 1. As detailed below, this appeal stems from an action seeking a declaratory judgment finding that the Act violates certain provisions of the West Virginia Constitution and further seeking preliminary and permanent injunctions to prevent its enforcement.

### C. Procedural History of Current Appeal

The Labor Unions,[30] initiated the action underlying this appeal on June 27, 2016, when they filed a petition, followed by an amended petition, seeking a declaratory judgment finding that the Act violated certain provisions of the West Virginia Constitution[31] and thereby infringed upon their rights to associate, as well as their liberty

---

[30] There is one respondent/plaintiff below who is an individual, Amanda Gaines. According to the petition filed in the circuit court, Ms. Gaines is a member of the Chauffeurs, Teamsters, and Helpers Local Union No. 175 and an employee of Stonerise Healthcare Systems dba Clarksburg Center LLC. The collective bargaining agreement governing Ms. Gaines's employment was set to expire on July 31, 2016. Therefore, any newly negotiated agreement would be subject to the provisions of the Act. *See* W. Va. Code § 21-5G-7 (LexisNexis 2019).

[31] The Labor Unions claimed below that the Act violated article III, sections 1, 3, 7, 9, 10, and 16, and article VI, section 30, of the West Virginia Constitution.

and property rights.[32]   In addition, the Labor Unions sought preliminary and permanent injunctions to prevent enforcement of the Act.  The amended petition named the following defendants: the Governor of the State of West Virginia, currently the Honorable James C. Justice ("the Governor");[33] the West Virginia Attorney General, the Honorable Patrick Morrisey ("the Attorney General"); and the Kanawha County Prosecuting Attorney.  The Prosecuting Attorney was subsequently dismissed by agreed order.  The State of West Virginia intervened.  (The defendants below, distinct from the petitioners herein, will be collectively referred to as "the State Defendants").[34]

On August 10, 2016, the circuit court held a hearing on the Labor Unions' motion for a preliminary injunction.  The Labor Unions presented only one witness, Ken

---

[32] The Labor Unions also sought a declaration that the Act did not apply to collective bargaining laws or agreements in the building and construction industries; however, this claim was rendered moot by a subsequent legislative amendment that deleted the portion of the former West Virginia Code section 21-5G-7 that referred to the building and construction industry.  *See* S.B. 330, 83rd Leg., Reg. Sess. (W. Va. 2017); Vol. 1, 2017 W. Va. Acts 1211.  No issue related to this amendment has been raised on appeal.

[33] The Honorable Earl Ray Tomblin was Governor of the State of West Virginia at the time this action was filed.  He was succeeded in January 2017 by the Honorable James C. Justice.

[34] The defendants below, who we refer to as "the State Defendants," include the Governor.  While the Governor is a party to this appeal, he did not join the petition for appeal.  Instead, the Governor filed a summary response stating that he takes no position on the merits of this appeal and acknowledging that he is constitutionally obligated to faithfully execute the laws of the state of West Virginia as determined by this Court's decision in this case.  Because the Governor did not join in the arguments asserted in the petition for appeal, when we refer to the parties who joined in that petition, we will use "the State."

Hall ("Mr. Hall"), who is the president of the Chauffeurs, Teamsters and Helpers Local No. 175 ("Teamsters Local No. 175") and General Secretary Treasurer of the International Brotherhood of Teamsters. Through the testimony of Mr. Hall, the Labor Unions admitted six documents into evidence. Two of these documents were charts prepared at Mr. Hall's behest by a bookkeeper employed by Teamsters Local No. 175. One of these charts depicted the expenses incurred, purportedly by the Teamsters Local No. 175, over a four-year period between 2013 and 2016. It further reported the total income for the union during those years and calculated the amount of dollars the union would lose if its membership dropped by ten, fifteen, or twenty percent. Finally, it estimated the additional dues that would be charged to union members to make up for those potential losses. The second chart reported the amount spent on arbitration proceedings during the same four-year period, and, according to Mr. Hall's testimony, further reported the amount of the fees charged by arbitrators for the five most expensive arbitrations that occurred during those years. Of the four remaining documents, one was a report by the U.S. Bureau of Labor Statistics titled "Union affiliation of employed wage and salary workers by state," which provided annual averages for the years 2014 and 2015.[35] A second document was a chart prepared at Mr. Hall's request by the "director of strategic research at the international union in Washington[.]" Mr. Hall testified that it repeated the information provided by the U.S. Bureau of Labor Statistics, and added information regarding the number of bargaining

---

[35] Portions of the copy of this document contained in the record are illegible.

16

unit employees who were not paying dues to the union.[36] Also admitted was a "Certification of Representative" from the National Labor Relations Board certifying that the Teamsters Local No. 175 had been certified as the exclusive collective-bargaining representative for certain workers employed by Airgas USA, LLC, in Charleston, West Virginia. Finally, the Labor Unions admitted a report, titled "The Economic Impact of Right to Work Policy in West Virginia," that had been prepared by the Bureau of Business & Economic Research of the West Virginia University College of Business and Economics, and was funded by the West Virginia Legislature. Based, in part, upon this report, Mr. Hall estimated generally that union membership drops by about twenty percent in states that have enacted right-to-work legislation. After the close of testimony, and arguments were presented by the parties, the circuit court announced from the bench:

> I believe at this time that it would be appropriate to award a preliminary injunction as to the operation of the provisions of Senate Bill 1.
>
> I think there have been arguments raised such that the four factors that this Court is to consider [in deciding whether to grant a preliminary injunction] have been met by the plaintiffs.

The circuit court additionally denied a motion to stay its ruling.

The parties then filed cross-motions for summary judgment, and the circuit court heard arguments on those motions on December 2, 2016. Following the hearing, the

---

[36] The record copy of this document also is largely illegible.

circuit court deferred ruling on the motions and instructed the parties to submit findings of fact and conclusions of law to support their respective positions.

On February 23, 2017, the circuit court entered its order granting the preliminary injunction requested by the Labor Unions. The next day, the circuit court issued a superseding and final order granting the preliminary injunction.[37] On February 27, 2017, the State filed its notice of appeal. Oral arguments were held and the case was submitted on September 5, 2017.

In its majority opinion, issued on September 15, 2017, this Court examined each of the three categories under which the Labor Unions challenged the constitutionality of the Act — associational rights, property rights, and liberty interests — under a "comparative hardship" analysis that focused on the plaintiffs' likelihood of success on the merits. Based, in part, upon the lack of authority supporting the Labor Unions' position, other state authority, and decisions by the United States Supreme Court that had rejected similar constitutional attacks on right-to-work legislation, the *Morrisey I* Court concluded that the Labor Unions had failed to establish, beyond a reasonable doubt, *any* likelihood of success on the merits as to any of the three theories they argued in support of a finding that the Act is unconstitutional. Based on this conclusion, the *Morrisey I* Court found that the circuit court had abused its discretion by granting the Labor Unions' request for a

---

[37] The superseding order made minor changes to the February 23, 2017 order.

preliminary injunction, reversed the circuit court's order, dissolved the preliminary injunction, and remanded the case for final resolution.

On remand, the parties advised the circuit court that they would present no additional evidence or arguments and that they agreed there were no disputed issues of material fact. By order entered on February 27, 2019, the circuit court disposed of the case on the existing evidence by granting partial summary judgment in favor of the State Defendants[38] and partial summary judgment in favor of the Labor Unions. Despite this Court's ruling in *Morrisey I*, the circuit court granted summary judgment in favor of the Labor Unions on their claims that the ban on compelled dues[39] contained in West Virginia

---

[38] The circuit court granted summary judgment in favor of the State Defendants with respect to two issues. First, the circuit court granted summary judgment to the State Defendants on the Labor Unions' claim that the Act violated article 6, section 30 of the West Virginia Constitution by embracing more than one object. In addition, the circuit court granted summary judgment to the State Defendants on the Labor Unions' claim that they were exempt from the operation of the Act by language that had been included in the Act pertaining to the building and construction industry. Because the relevant language was removed by the 2017 amendments to the Act, the claim was deemed moot, and summary judgment was granted to the State Defendants as to that claim. The Labor Unions have not appealed these rulings.

[39] We find the term "compelled dues" is a more accurate label for what is often identified as "agency fees." The term "agency fees" is used to refer to the compelled dues required of members of a collective bargaining unit who do not wish to formally join a labor organization that has been designated as the exclusive bargaining representative for the bargaining unit. *See Harris v. Quinn*, 573 U.S. 616, 624, 134 S. Ct. 2618, 2625, 189 L. Ed. 2d 620 (2014) (explaining that an "agency-fee provision" is "a provision under which members of a bargaining unit who do not wish to join the union are nevertheless required to pay a fee to the union"). These compelled dues typically are lower in comparison to the dues paid by voluntary members of the labor organization because they may include only that portion of dues that is expended by the labor organization for collective bargaining related expenses. *See Janus v. Am. Fed'n of State, Cty., & Mun.*

19

Code sections 21-lA-3 and 21-5G-2 violated the West Virginia Constitution because it infringed upon labor organizations' association rights, property rights, and liberty interests. The circuit court, sua sponte, stayed the effect of the order for a period of thirty days from the entry thereof to accommodate any potential appeal of the order. Then, on March 27, 2019, the State filed a motion asking this Court to stay enforcement of the circuit court's February 27, 2019, order. The Court granted the motion for stay by order entered on March 27, 2019. This appeal by the State followed.

## II.

## STANDARD OF REVIEW

This appeal from circuit court rulings that granted summary judgment is subject to de novo review.[40] In conducting this plenary review, we are mindful that

> [s]ummary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

Syl. pt. 4, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). *Accord* Syl. pt. 2, *Williams v. Precision Coil, Inc.*, 194 W. Va. 52, 459 S.E.2d 329 (1995). We also observe

---

*Employees, Council 31*, ___ U.S. ___, ___, 138 S. Ct. 2448, 2456, 201 L. Ed. 2d 924 (2018) (describing "agency fee" as "a percentage of the full union dues"). The United States Supreme Court has found that, under the NLRA, compelled dues may not be used for political purposes over the objection of the worker paying the dues. *Commc'ns Workers of Am. v. Beck*, 487 U.S. 735, 108 S. Ct. 2641, 101 L. Ed. 2d 634.

[40] *See* Syl. pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994) ("A circuit court's entry of summary judgment is reviewed *de novo*.").

20

that, "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Cas. & Sur. Co. v. Fed. Ins. Co. of N.Y.*, 148 W. Va. 160, 133 S.E.2d 770 (1963).

Because this appeal requires us to pass upon the constitutionality of certain statutory provisions, we note that "[t]he constitutionality of a statute is a question of law which this Court reviews *de novo*." Syl. pt. 1, *State v. Rutherford*, 223 W. Va. 1, 672 S.E.2d 137 (2008). *See also* Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."). However, we also must be cognizant of the separation of powers and the near plenary authority of the Legislature to act within constitutional boundaries:

> In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative[,] and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt.

21

Syl. pt. 1, *State ex rel. Appalachian Power Co. v. Gainer*, 149 W. Va. 740, 143 S.E.2d 351 (1965).[41]  In other words,

> "[a]cts of the Legislature are presumed to be constitutional, and courts will interpret legislation in any reasonable way which will sustain its constitutionality. *State ex rel. City of Charleston v. Coghill*, 156 W. Va. 877, 207 S.E.2d 113 (1973); *State ex rel. Appalachian Power Co. v. Gainer*, 149 W. Va. 740, 143 S.E.2d 351 (1965).  Thus where a statute is susceptible of more than one construction, one which renders the statute constitutional, and the other which renders it unconstitutional, the statute will be given the construction which sustains constitutionality. *State ex rel. Slatton v. Boles*, 147 W. Va. 674, 130 S.E.2d 192 (1963), *Board of Education v. Board of Public Works*, 144 W. Va. 593, 109 S.E.2d 552 (1959)." *State ex rel. Frieson v. Isner*, 168 W. Va. 758, 778-79, 285 S.E.2d 641, 655 (1981).

Syl. pt. 2, *State ex rel. Frazier v. Meadows*, 193 W. Va. 20, 454 S.E.2d 65 (1994).


Mindful of the foregoing standards, we address the particular issues raised in this appeal.


## III.

## DISCUSSION

The State assigns error to three rulings made by the circuit court, which found that the legislative enactments at issue violate the West Virginia Constitution by infringing

---

[41] *See also* Syl. pt. 1, *Foster v. Cooper*, 155 W. Va. 619, 186 S.E.2d 837 (1972) ("The Constitution of West Virginia being a restriction of power rather than a grant thereof, the [L]egislature has the authority to enact any measure not inhibited thereby.").

upon the Labor Unions' rights of association, property rights, and liberty interests.[42]  We

address each of these issues in turn.

### A.  Association Rights

The right to voluntarily associate has long been an inherent and

distinguishing quality of American life.  As French scholar Alexis de Tocqueville once

observed,

> [i]n no country in the world has the principle of association been more successfully used, or more unsparingly applied to a multitude of different objects, than in America. Besides the permanent associations which are established by law under the names of townships, cities, and counties, a vast number of others are formed and maintained by the agency of private individuals.

Alexis de Tocqueville, *Democracy in America* 170 (Henry Reeve, trans 1838).  In this case,

however, Labor Unions would have us link an organization's desire to compel an

individual to associate to the individual's right to associate.  This we will not do.

In addressing the Labor Unions' claim of association rights, we first review

the particular constitutional provisions at issue in this case.  We then summarize the

challenged circuit court ruling and the arguments presented by the parties.  Finally, we

analyze the issue presented and provide our conclusion.

---

[42] The State additionally asserts on appeal that the circuit court's decision conflicts with federal labor law.  Because we overrule the circuit court's decision on other grounds, we do not reach this issue.

**1. Association Rights under article III, sections 7 and 16 of the West Virginia Constitution.** The circuit court concluded that prohibiting compelled dues under the Workplace Freedom Act[43] and the West Virginia Labor Management Relations Act[44] violated rights of association guaranteed to the Labor Unions under article III, sections 7 and 16 of the West Virginia Constitution. Article III, section 7 addresses freedom of speech and provides that

> [n]o law abridging the freedom of speech, or of the press, shall be passed; but the Legislature may, by suitable penalties, restrain the publication or sale of obscene books, papers, or pictures, and provide for the punishment of libel, and defamation of character, and for the recovery, in civil actions, by the aggrieved party, of suitable damages for such libel, or defamation.

This provision has been found to incorporate the protection of an individual's associational rights.[45]

Similarly, article III, section 16 of the West Virginia Constitution includes a right "to consult for the common good": "The right of the people to assemble in a peaceable manner, to consult for the common good, to instruct their representatives, or to

---

[43] *See* W. Va. Code § 21-5G-2.

[44] *See* W. Va. Code§ 21-lA-3.

[45] *See Pushinsky v. W. Va. Bd. of Law Exam'rs*, 164 W. Va. 736, 748-49, 266 S.E.2d 444, 451 (1980) (concluding that questions that inquired into beliefs and associations of applicant for admission to the West Virginia State Bar unconstitutionally infringed upon applicant's association rights guaranteed under West Virginia Constitution article III, section 7).

24

apply for redress of grievances, shall be held inviolate." W. Va. Const. art. III, § 16. We have recognized that "[t]he protections inherent and explicit in this state constitutional provision [article III, section 16 of the West Virginia Constitution] parallel associational . . . protections found under the first amendment." *Woodruff v. Bd. of Trs. of Cabell Huntington Hosp.*, 173 W. Va. 604, 609, 319 S.E.2d 372, 378 (1984) (addressing association rights of public employees).[46]

No violation of federal constitutional rights has been asserted by the Labor Unions in this litigation. However, "a state may not interpret its constitutional guarantee [that] is identical to a federal constitutional guarantee below the federal level[.]" *Adkins v. Leverette*, 161 W. Va. 14, 19-20, 239 S.E.2d 496, 499 (1977). Because of the federal constitutional threshold, consideration of federal precedent is relevant in addressing corresponding protections under our own constitution. The circuit court found that such precedent would merely "provide a floor for interpretation of the Article III protections in §§ 7 and 16." Relying on a finding made by this Court in *Pushinsky v. West Virginia Board of Law Examiners*, the circuit court summarily concluded that limitations on the power of

---

[46] *See also Watson v. W. Va. Dep't of Health & Human Res.*, No. 11-0191, 2012 WL 2924123, at *3 n.3 (W. Va. Jan. 19, 2012) (memorandum decision) (commenting that "[a]rticle III, section 16 of the West Virginia Constitution secures the right to association," and finding no violation of an employee's right of intimate association). These authorities support the existence of an *individual's* right to associate. The parties to this appeal do not provide support for the proposition that, under the West Virginia Constitution, a Labor Organization has a protected right to associate that is distinct from the right of its individual members. Nevertheless, for the purposes of our discussion of this case, we will assume, without deciding, that such a right exists.

25

West Virginia to curtail association rights are "'"more stringent than those imposed on the states by the Constitution of the United States."'" (Quoting *Pushinsky*, 164 W. Va. at 745, 266 S.E.2d at 449).[47]

We agree with the principle that "we may interpret our own Constitution to require higher standards of protection than afforded by comparable federal constitutional standards." *Pauley v. Kelly*, 162 W. Va. 672, 679, 255 S.E.2d 859, 864 (1979) (citing *Adkins*, 161 W. Va. at 19-20, 239 S.E.2d at 499).[48] However, we disagree that the West Virginia Constitution affords greater protection of association rights in the context of the instant matter than does the United States Constitution.

The *Puchinsky* case relied upon by the circuit court involved the West Virginia Board of Law Examiners refusing to process an application for admission to the West Virginia State Bar because the *applicant* refused to answer "questions relating to his advocacy of or knowing affiliation with organizations advocating the violent or forceful

---

[47] The circuit court cited two additional opinions by this Court, *Woodruff v. Board of Trustees of Cabell Huntington Hospital*, 173 W. Va. 604, 611, 319 S.E.2d 372, 379 (1984), and *West Virginia Citizens Action Group, Inc. v. Daley*, 174 W. Va. 299, 324 S.E.2d 713 (1984), but the court failed to explain how these cases direct a more stringent standard in this instance. The Labor Unions' appellate brief likewise provides only a bare assertion.

[48] *See also* Syl. pt. 2, *Pauley*, 162 W. Va. 672, 255 S.E.2d 859 ("The provisions of the Constitution of the State of West Virginia *may*, *in certain instances*, require higher standards of protection than afforded by the Federal Constitution." (emphasis added)).

26

overthrow of the government." *Pushinsky*, 164 W. Va. at 737, 266 S.E.2d at 445. This Court found heightened protections were warranted because of a unique provision contained in our state constitution:

> [I]n view of our state constitutional provision regarding the right of the majority to "reform, alter, or abolish" an inadequate government, we think that the West Virginia Constitution offers limitations on the power of the state *to inquire into* lawful associations and speech more stringent than those imposed on the states by the Constitution of the United States.

*Pushinsky*, 164 W. Va. at 744-45, 266 S.E.2d at 449 (emphasis added).[49] Such grounds for heightened protections have not been presented in this case. The circuit court and the Labor Unions have failed to direct us to a provision of the West Virginia Constitution, or provided any other rationale, under which the protection of association rights claimed by a labor organization may be entitled to more stringent treatment than that provided by the United States Constitution. Accordingly, for the purpose of our analysis of the associational rights at issue in this case, we find no grounds to apply a more stringent level of protection than that afforded under the United States Constitution.

---

[49] *See also Woodruff*, 173 W. Va. at 611, 319 S.E.2d at 379 (applying heightened protections with respect to the *waiver* of fundamental rights under the West Virginia Constitution because "[n]o parallel provision to [article III, section 1 of the West Virginia Constitution] appears in the United States Constitution. Therefore, with respect to *the waiver of* fundamental constitutional rights, our state constitution is more stringent in its limitation on *waiver* than is the federal constitution." (emphasis added)). Article III, section 1 of the West Virginia Constitution prohibits waiver of certain constitutional freedoms and rights.

"The U.S. Supreme Court has recognized two types of constitutionally protected association under the First Amendment: intimate[50] and expressive." *Beverly Hills Suites LLC v. Town of Windsor Locks*, 136 F. Supp. 3d 167, 186 (D. Conn. 2015). This case involves expressive association, which has been described as "a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618, 104 S. Ct. 3244, 3249, 82 L. Ed. 2d 462 (1984). With these basic principles in mind, we consider the circuit court's order in light of the arguments herein raised.

**2. Summary of the circuit court's ruling and the parties' arguments relating to association rights.** The circuit court held that the prohibition of compelled dues contained in the Act,[51] and the associated enforcement of that ban through criminal

---

[50] Under the right of "intimate association," it is recognized that

> choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty.

*Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18, 104 S. Ct. 3244, 3249, 82 L. Ed. 2d 462 (1984).

[51] *See* W. Va. Code § 21-1A-3 and § 21-5G-2(2).

penalties and civil liabilities,[52] infringe on the association rights of labor organizations and their members in violation of article III, sections 7 and 16 of the West Virginia Constitution. The circuit court reasoned that the prohibition of compelled dues hampers the Labor Unions' ability to recruit new members and to retain existing ones because workers would be able to receive the full benefit of union representation without incurring any cost and would, thus, have no incentive to join the union or remain a member. The circuit court further opined that those who do remain members of the union would pay a

---

[52] *See* W. Va. Code § 21-5G-4 for the criminal penalties referred to by the circuit court, and W. Va. Code § 21-5G-5 for the civil relief provided. Although the circuit court referenced these criminal penalties and civil liabilities that may be imposed for violations of the Act, the circuit court did not provide any analysis related to the constitutionality of these provisions. Likewise the parties have not provided arguments related to these provisions in their briefs to this Court, but instead only mention them in passing. Nevertheless, we note that the United States Supreme Court has recognized that, when the Taft-Hartley amendments were being considered, twelve states had enacted some form of right-to-work legislation "about which Congress seems to have been well informed during the 1947 debates—[and which] had a wide variety of sanctions, including injunctions, damage suits, and *criminal penalties*." *Retail Clerks Int'l Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 100, 84 S. Ct. 219, 221, 11 L. Ed. 2d 179 (emphasis added) (footnote omitted). The Court went on to explain that,

> [i]n light of the wording of [29 U.S.C. § 164(b)] and this legislative history, we conclude that Congress in 1947 *did not deprive the States of any and all power to enforce their laws restricting the execution and enforcement of union-security agreements*. Since it is plain that Congress left the States free to legislate in that field, we can only assume that it intended to leave unaffected the power to enforce those laws. Otherwise the reservation which Senator Taft felt to be so critical would become empty and largely meaningless.

*Schermerhorn*, 375 U.S. at 102, 84 S. Ct. at 222, 11 L. Ed. 2d 179 (emphasis added). Therefore, it is apparent that the imposition of criminal penalties and civil liability does not render the Act unconstitutional.

29

penalty, because their dues would necessarily be increased to underwrite the union's services provided to the bargaining unit employees who have chosen not to join the union. Acknowledging that "West Virginia clearly has legitimate and substantial interests in protecting workers from being forced to support political and ideological messages with which they disagree or to join an organization they do not support," the circuit court found that protection of those interests has been accomplished by requiring labor organizations "to reimburse [their] members working under union shop contracts for that portion of their dues spent on advocacy of causes with which they disagree."[53] The circuit court rejected the argument that workers have a right *not* to associate that is protected by the Act, and reasoned that the payment of compelled dues by nonmembers of the union is not the equivalent of union membership.

The State argues that the circuit court erred in finding that the Act infringes on the right of the Labor Unions to associate because there is nothing in the Act that prevents a person from making a voluntary choice to associate with a union or to pay union dues. Instead, the Act removes the Labor Unions' ability to force nonconsenting employees to pay any form of dues. The circuit court relied heavily upon a line of cases

---

[53] The circuit court cited *Commc'ns Workers of Am. v. Beck*, 487 U.S.735, 108 S. Ct. 2641, 101 L. Ed. 2d 634, as support for its conclusion. S*ee supra* note 39 for the relevant holding of *Beck*. The circuit court additionally cited *Chicago Teachers Union, Local No. 1, AFT, AFL-CIO v. Hudson*, 475 U.S. 292, 106 S. Ct. 1066, 89 L. Ed. 2d 232 (1986), which established basic requirements for the procedure to be used by labor organizations to ensure that compelled dues from employees who objected to expenditures unrelated to collective bargaining were not used for impermissible purposes.

involving the NAACP wherein various methods, such as forced disclosure of the identities of NAACP members, lead to efforts to retaliate against those who chose to become members. The State contends that the Act's prohibition of compelled dues differs significantly from the circumstances presented in the Civil Rights era cases since prohibiting compelled dues simply does not result in retribution or punitive action as was at issue in the NAACP cases. In addition, quoting from this Court's prior decision in *Morrisey I*, the State observes that the circuit court's adoption of the Labor Unions' argument in favor of forcing nonconsenting employees to pay for union activities was erroneous insofar as the argument is "nearly identical to one rejected by the United States Supreme Court almost seven decades ago." *Morrisey I*, 239 W. Va. at 640, 804 S.E.2d at 890.[54] The State further contends that the circuit court failed to meaningfully consider a line of precedent foreclosing the idea that a statute potentially making it harder to recruit members violates a union's associational rights by concluding that a "legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 103 S. Ct. 1997, 76 L. Ed. 2d 129 (1983). Finally, the State argues that the Act protects the rights of employees by giving them the freedom not to associate.

---

[54] The *Morrisey I* Court was referring to *Lincoln Federal Labor Union No. 19129, American Federation of Labor v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 69 S. Ct. 251, 93 L. Ed. 212 (1949).

The Labor Unions respond that the Act violates their right to associate with employees to advance workers' causes. The Labor Unions equate the portion of the Act banning compelled dues with measures used to curtail membership in the NAACP civil rights cases discussed above. Reflecting on the long history of unions and their members receiving constitutional protection for the exercise of their associational rights, *i.e.*, through court decisions that struck laws directed at blocking unions' organizing efforts or requiring union organizers to register with the state in an effort to stop or punish those organizers, the Labor Unions argue that these decisions provide a floor for interpreting West Virginia's constitution.[55] The Labor Unions contend that, because of their obligation as the exclusive bargaining agents to represent all members of a bargaining unit, depriving them of compelled dues would mean that workers who pay nothing would receive free representation. Those workers would then have no incentive to join the union or remain members, while workers who join a union or remain members will pay a penalty in the form of higher dues needed to underwrite the union services provided to bargaining unit employees who have chosen not to join the union. The Labor Unions contend that workers already are adequately protected from being forced to support political and ideological messages with which they disagree by federal law that requires unions to reimburse

---

[55] We already have rejected this argument in our preceding discussion wherein we conclude that the Labor Unions have provided us with no persuasive grounds in this case for giving the West Virginia Constitution a more stringent application than the United States Constitution under the circumstances herein presented.

workers who are under a union shop contract for that portion of their dues spent on advocacy of causes with which they disagree.[56]

**3. Analysis.** As we explained above, states are expressly authorized by the NLRA to enact laws that prohibit closed shop agreements as well as contracts that require compelled dues of any kind as a condition of employment or as a condition for the continuation of employment. Indeed, twenty-seven states have enacted either a constitutional amendment, a statue, or both, directed at protecting an employee's right to work without being compelled to join a union either as a condition of employment or as a condition for the continuation of employment. To be more specific, ten states have right-to-work provisions in their constitutions.[57] Eight States have enacted statutory right to

---

[56] In support of this proposition, the Labor Unions cite *Beck*, 487 U.S. 735, 108 S. Ct. 2641, 101 L. Ed. 2d 634, and *Chicago Teachers Union,* 475 U.S. 292, 106 S. Ct. 1066, 89 L. Ed. 2d 232.

[57] *See* Ala. Const. art. I, § 36.05 (adopted 2016) (declaring that no person may be denied employment due to membership or nonmembership in labor organization, nor may employment be conditioned upon the payment of dues, fees, or other charges of any kind to a labor organization); Ariz. Const. art. XXV (adopted 1946) (providing, in part, that no person may be denied employment due to nonmembership in a labor organization); Ark. Const. amend. XXXIV, § 1 (adopted 1944) (barring employment discrimination based upon union membership or nonmembership and barring compelled payment of dues to any labor organization as a condition of employment); Fla. Const. of 1968 art. I, § 6 (establishing right-to-work that is not denied or abridged on account of membership or nonmembership in labor organization); Kan. Const. art. XV, § 12 (adopted 1957) (declaring that no person shall be denied the opportunity to obtain employment due to membership or nonmembership in a labor organization and prohibiting agreements that exclude persons from employment on same grounds); Miss. Const. art 7, § 198A (adopted 1960) (proclaiming public policy against, among other things, any agreement requiring union membership or payment of dues, fees, or other charges, as a condition of employment or continued employment); Neb. Const. art. XV, § 13 (adopted 1946) (protecting right-to-

work provisions.[58] Most notably, seventeen states have provisions that, like West Virginia, expressly prohibit the requirement of compelled dues as a condition of employment or as a condition for the continuation of employment.[59]

---

work without requirement related to membership in or affiliation with a labor organization); N.D. Const. art. I, § 7 (adopted 1889) (pronouncing that every citizen of North Dakota shall be free to obtain employment wherever possible); Okla. Const. art. XXIII, § 1A (adopted 2001) (prohibiting employment from being conditioned upon becoming or remaining a member of a labor organization, or payment of dues, fees, assessments, or other charges to a labor organization); S.D. Const. art. VI, § 2 (adopted 1946) (preserving right-to-work without requirement for membership in any labor organization).

[58] *See* Ariz. Rev. Stat. Ann. § 23-1302 (2016; enacted 1947) (disallowing the denial of opportunity to obtain or retain employment based on nonmembership in a labor organization); Fla. Stat. Ann. § 447.03 (West 2013, enacted 1974) (preserving the right of employees to "self-organization, to form, join, or assist labor unions or labor organizations or to refrain from such activity"); Iowa Code Ann. § 731.2 (West 2013; enacted 1977) (declaring it unlawful to refuse or deny employment based on a refusal to join or affiliate with a labor organization); Nev. Rev. Stat. § 613.250 (2017; enacted 1953) (barring denial of employment or continuation of employment based upon nonmembership in a labor organization); N.D. Cent. Code § 34-01-14 (2014; enacted 1947) (instructing that the right-to-work may not be denied based on membership or nonmembership in any labor organization); S.D. Codified Laws § 60-8-3 (2015; enacted 1947) (preserving right of any person to work without membership in labor organization); Tex. Labor Code Ann. § 101.301 (West 2015; enacted 1995) (declaring that the right-to-work may not be denied because of membership or nonmembership in a labor organization); Wyo. Stat. Ann. § 27-7-109 (2019; enacted 1963) (ordering that no person may, as a condition of employment or continuation of employment, be required to become or remain a member of a labor organization).

[59] *See* Ala. Code § 25-7-34 (LexisNexis 2016; enacted 1953) (prohibiting, *inter alia*, payment of any dues, fees, or other charges to a labor organization as a condition of employment); Ark. Code Ann. § 11-3-303 (2012; enacted 1947) (proscribing denial of employment based upon membership in, affiliation with, nonmembership in, or non-affiliation with a labor organization; also proscribing compelled dues or other monetary consideration to a labor organization); Ga. Code Ann. § 34-6-23 (2017; enacted 1947) (voiding, as contrary to public policy, any contractual provision between an employer and a labor organization that requires, as a condition of employment, any employee to be or remain a member or an affiliate of a labor organization or to pay any fee, assessment, or

other sum of money to a labor organization); Idaho Code § 44-2003 (2014; enacted 1985) (providing, in part, that no person shall be required to become or remain a member of a labor organization, or be required to pay any dues, fees, assessments, or other charges of any kind to a labor organization as a condition of employment); Ind. Code Ann. § 22-6-6-8 (LexisNexis 2019; enacted 2012) (specifying that a person may not, as a condition of employment or continued employment, be required to become or remain a member of a labor organization, or to pay dues, fee, assessments, or other charges to a labor organization); Ky. Rev. Stat. Ann. § 336.130 (LexisNexis Supp. 2019; enacted 2017) (stating that employment shall not be conditioned upon membership in a labor organization or payment of any dues, fees, assessments, or similar charges); La. Stat. Ann. § 23:983 (2010; enacted 1976) (providing that no person, as a condition of employment, shall be required to become or remain a member of a labor organization, or be required to pay any dues, fees, assessments, or other charges to a labor organization); Mich. Comp. Laws Serv. § 423.14 (LexisNexis 2013; enacted 2012) (mandating that no individual shall, as a condition of obtaining or continuing employment, be required, *inter alia*, to remain or become a member of a labor organization or pay any dues, fees, assessments, or other charges to a labor organization); Miss. Code. Ann. § 71-1-47 (West 2009; enacted 1954) (upholding, *inter alia*, a right-to-work without requirement of membership in a labor organization or payment of dues, fees, or other charges to labor organization); Neb. Rev. Stat. § 48-217 (2010; enacted 1947) (making operative constitutional provisions against conditioning employment upon, *inter alia,* membership in or affiliation with a labor organization or payment of a fee to a labor organization); N.C. Gen. Stat. § 95-80 (2017; enacted 1947) (announcing that no person shall be required to become or remain a member of a labor organization as a condition of employment or the continuation of employment) and N.C. Gen. Stat. § 95-82 (2017; enacted 1947) (prohibiting employers from requiring payment of dues, fees, or other charges to a labor organization as a condition of employment); S.C. Code Ann. § 41-7-30 (1986; enacted 1954) (stating that it is unlawful for an employer to condition employment upon becoming or remaining a member of a labor organization or paying any fees, dues, assessments, or other charges to such organization); Tenn. Code Ann. § 50-1-201 (2014; enacted 1947) (specifying that it is unlawful to deny or attempt to deny employment to any person due to, *inter alia*, resignation from or refusal to join or affiliate with any labor organization) and Tenn. Code Ann. § 50-1-203 (2014; enacted 1947) (making it unlawful to exclude a person from employment for failure to pay dues, fees, or other charges to labor organization); Utah Code Ann. § 34-34-1 to -7 (LexisNexis 2019; enacted 1969) (establishing public policy that the right-to-work may not be abridged because of membership or nonmembership in a labor organization; and prohibiting employers from conditioning employment upon membership in labor organization, or upon payment of dues, fees, or other charges to labor organization); Va. Code Ann. § 40.1-60 (2013; enacted 1970) (declaring that no person shall be required, as a condition of employment, to become or remain a member of a labor organization) and Va. Code Ann. § 40.1-62 (2013; enacted 1970) (prohibiting employers from conditioning employment upon employee's payment of dues, fees, or other charges

Even though right-to-work laws have existed for over seventy years, and most prohibit compelled dues, "the unions have not directed us to any federal or state appellate court that, in over seven decades, has struck down such a law." *Morrisey I*, 239 W. Va. at 637, 804 S.E.2d at 887.

Particularly in light of the fact that, on remand from *Morrisey I*, no additional evidence or arguments were presented to the circuit court by the parties, we reiterate our conclusion from *Morrisey I* that the grounds asserted by the Labor Unions, which were relied upon by the circuit court to find the ban of compelled dues to be unconstitutional, have been universally rejected in other contexts. As this Court recognized in *Morrisey I*, "the constitutional freedom of association argument proffered by the unions is nearly identical to one rejected by the United States Supreme Court almost seven decades ago." 239 W. Va. at 640, 804 S.E.2d at 890 (referencing the prohibition of closed shop agreements addressed in *Lincoln Fed. Labor Union No. 19129, A.F. of L. v. Nw. Iron & Metal Co.*, 335 U.S. 525, 69 S. Ct. 251, 93 L. Ed. 212 (1949)). In *Lincoln Federal*, the United States Supreme Court declined to find that laws prohibiting closed shop agreements, contracts whereby employers agreed to hire only workers who were members of the labor organization, were unconstitutional infringements on labor organizations' rights of free

---

to a labor organization); Wis. Stat. Ann. § 111.04 (West 2018; enacted 2015) (stipulating that employment may not be conditioned upon membership in a labor organization or the payment of any dues, fees, or other charges to labor organization).

speech, assembly, and petition. *See Lincoln Fed.*, 335 U.S. 525, 69 S. Ct. 251, 93 L. Ed. 212.

While the rights asserted in *Lincoln Federal* differ from those asserted in the instant matter, the rationale of the Supreme Court is, nevertheless, persuasive in the context of association rights, and even touched on those rights.[60] Similar to the argument presented here, in *Lincoln Federal* the union argued that a closed shop was "indispensable to achievement of sufficient union membership to put unions and employers on a full equality for collective bargaining, a closed shop is consequently 'an indispensable concomitant' of 'the right of employees to assemble into and associate together through labor organizations. . . .'" *Lincoln Fed.*, 335 U.S. at 530, 69 S. Ct. at 254, 93 L. Ed. 212. The *Lincoln Federal* Court observed that "[n]othing in the language of the laws indicates a purpose to prohibit speech, assembly, or petition. Precisely what these state laws do is to forbid employers acting alone or in concert with labor organizations deliberately to restrict employment to none but union members." *Id.* The Court additionally commented that "[i]t is difficult to see how enforcement of this state policy could infringe the freedom of speech of anyone, or deny to anyone the right to assemble or to petition for a redress of grievances." *Id.* Ultimately, the *Lincoln Federal* Court found that

---

[60] The various First Amendment rights under the United States Constitution bear a relationship to each other. *See, e.g.*, *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460, 78 S. Ct. 1163, 1171, 2 L. Ed. 2d 1488 (1958) ("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.").

> [t]he constitutional right of workers to assemble, to discuss and formulate plans for furthering their own self interest in jobs *cannot be construed as a constitutional guarantee that none shall get and hold jobs except those who will join in the assembly* or will agree to abide by the assembly's plans.

*Id.* at 531, 69 S. Ct. at 254, 93 L. Ed. 212 (emphasis added). *Lincoln Federal* dealt with closed shop agreements as opposed to compelled dues, but the underlying premise is the same. In *Lincoln Federal* the Court rejected the argument that the government infringed upon the rights of the labor organizations by refusing to compel union membership as a condition of employment. For similar reasons, we find that the Legislature's refusal to force workers to pay compelled dues to labor organizations as a condition of employment, or as a condition for the continuation of employment, does not infringe on the right to associate.[61]

We also agree with the State's contention that the circuit court's reliance upon Civil Rights era cases in finding an infringement upon the Labor Unions' claimed association rights under the circumstances presented in this matter is misplaced. Those cases primarily involved efforts by the states to compel disclosure of NAACP members so that those members could be subjected to retribution for their membership in the

---

[61] As we previously stated, in note 46 *supra*, for purposes of our analysis of this case, we do not determine whether organizations such as labor unions have a right to associate separate and distinct from an individual's right that is protected by the West Virginia Constitution.

organization. Such state action would, if permitted, have had a chilling effect on the willingness of individuals to join or remain a member of the civil rights organization:

> We think that the production order, in the respects here drawn in question, must be regarded as entailing the likelihood of a substantial restraint upon the exercise by [NAACP] members of their right to freedom of association. [The NAACP] has made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility. Under these circumstances, we think it apparent that compelled disclosure of [the NAACP's] Alabama membership is likely to affect adversely the ability of [the NAACP] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure.

*NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 462-63, 78 S. Ct. 1163, 1172, 2 L. Ed. 2d 1488 (1958).[62]

---

[62] *See also Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 549, 83 S. Ct. 889, 895, 9 L. Ed. 2d 929 (1963) (noting that, in a companion case that arose from the same hearings and was apparently based upon the same record, the Florida Supreme Court "took notice of the 'considerable' evidence of possible or probable reprisals and deterrent effect on the N.A.A.C.P. resulting from involuntary disclosure of affiliation with the organization"); *NAACP v. Button*, 371 U.S. 415, 435-36, 83 S. Ct. 328, 339-40, 9 L. Ed. 2d 405 (1963) (concluding a Virginia statute that effectively barred the NAACP from recruiting plaintiffs to challenge segregation in schools violated First Amendment freedoms, and commenting that "[w]e cannot close our eyes to the fact that the . . . civil rights movement has engendered the intense resentment and opposition of the politically dominant white community of Virginia; litigation assisted by the NAACP has been bitterly fought. In such circumstances, a statute broadly curtailing group activity leading to litigation may easily become a weapon of oppression, however evenhanded its terms appear. Its mere existence could well freeze out of existence all such activity on behalf of the civil rights of Negro citizens."); *Louisiana ex rel. Gremillion v. NAACP*, 366 U.S. 293,

No such punitive action directed toward members of a labor organization for the purposes of retaliating or deterring membership is present in the instant matter. In this regard, the Act is neutral. As we previously stated, "we see nothing in [the Act] that prevents a person from making a voluntary choice to associate with a union or to pay union dues." *Morrisey I*, 239 W. Va. at 640, 804 S.E.2d at 890. There likewise is nothing within the Act to discourage or prevent labor organizations from soliciting workers to join their organization, nor does the Act facilitate retaliation upon those who voluntarily choose to become union members.[63]

---

295-96, 81 S. Ct. 1333, 1335, 6 L. Ed. 2d 301 (1961) (acknowledging that some affiliates of NAACP in Louisiana filed membership lists and that, after those filings, members were subjected to economic reprisals); *Shelton v. Tucker*, 364 U.S. 479, 486 & 486 n.7, 81 S. Ct. 247, 251 & 251 n.7, 5 L. Ed. 2d 231 (1960) (finding statute that, as a condition of employment at a state-supported school or college, compelled every teacher to disclose in an affidavit every organization to which he or she had belonged or regularly contributed violated teachers' federal association rights; noting that "[t]he record contains evidence to indicate that fear of public disclosure is neither theoretical nor groundless"; and observing that testimony showed one particular group "intended to gain access to some of the Act 10 affidavits with a view to eliminating from the school system persons who supported organizations unpopular with the group"); *Bates v. City of Little Rock*, 361 U.S. 516, 523-24, 80 S. Ct. 412, 417, 4 L. Ed. 2d 480 (1960) (commenting that "[o]n this record it sufficiently appears that compulsory disclosure of the membership lists of the local branches of the National Association for the Advancement of Colored People would work a significant interference with the freedom of association of their members. There was substantial uncontroverted evidence that public identification of persons in the community as members of the organizations had been followed by harassment and threats of bodily harm. There was also evidence that fear of community hostility and economic reprisals that would follow public disclosure of the membership lists had discouraged new members from joining the organizations and induced former members to withdraw. This repressive effect, while in part the result of private attitudes and pressures, was brought to bear only after the exercise of governmental power had threatened to force disclosure of the members' names." (footnote omitted)).

[63] In fact, during its 2020 Regular Session, the West Virginia Legislature enacted, and the Governor has already approved, new legislation entitled "The Protect Our

We readily acknowledge that there are different methods by which government action may infringe on the right of association.

> Government actions that may unconstitutionally infringe upon this freedom [of expressive association] can take a number of forms. Among other things, government may seek to impose penalties or withhold benefits from individuals because of their membership in a disfavored group, *e.g.*, *Healy v. James*, 408 U.S. 169, 180-184, 92 S. Ct. 2338, 2345-2347, 33 L. Ed. 2d 266 (1972); it may attempt to require disclosure of the fact of membership in a group seeking anonymity, *e.g.*, *Brown v. Socialist Workers '74 Campaign Committee*, *supra*, 459 U.S. 87, 91-92, 103 S. Ct. 416, 419-421, 74 L. Ed. 2d 250 (1982); and it may try to interfere with the internal organization or affairs of the group, *e.g.*, *Cousins v. Wigoda*, 419 U.S. 477, 487-488, 95 S. Ct. 541, 547, 42 L. Ed. 2d 595 (1975) [(involving state election code that conflicted with guidelines of the Democratic National Party for selection of delegates for its national convention)].

*Roberts*, 468 U.S. at 622-23, 104 S. Ct. at 3252, 82 L. Ed. 2d 462.[64]  The Act simply does not infringe upon any association rights the Labor Unions have attempted to claim here.

---

Right to Unite Act." *See* S.B. 16, 84th Leg., Reg. Sess. (W. Va. 2020) ("Right to Unite Act").  The Right to Unite Act, which will be codified at West Virginia Code sections 1-7-1 to -4, operates to protect individual rights of West Virginia citizens to privacy in their associations by prohibiting public agencies from requiring any nonprofit entity to disclose its donor or membership information.  In addition, the Right to Unite Act prohibits a public agency from releasing such information if it is obtained, and exempts such donor and membership information from the disclosure requirements of the West Virginia Freedom of Information Act.  Thus, the Right to Unite Act will protect the right of West Virginia citizens, including union members, to privately associate in much the same way as the civil rights cases discussed above.

[64] The *Roberts* Court found a Minnesota Act that required Minnesota chapters of the United States Jaycees to admit women as full voting members infringed on the Jaycees' expressive association rights by interfering with the internal organization or affairs of the group, but found further that the infringement was justified.  468 U.S. 609, 104 S. Ct. 3244, 82 L. Ed. 2d 462.

Instead, it operates to protect the right of workers to not be forced to associate against their will. "Freedom of association . . . plainly presupposes a freedom not to associate." *Roberts*, 468 U.S. at 623, 104 S. Ct. at 3252, 82 L. Ed. 2d 462.[65] By protecting workers from being forced to fund labor organizations as a condition of their employment, or as a condition for the continuation of employment, the Legislature does not thereby infringe on any association right labor organizations may claim under the West Virginia Constitution. "[A] legislature's decision not to subsidize the exercise of a fundamental right does not

---

[65] Although the Labor Unions seek to distinguish membership from paying "fees" for services rendered, the United States Supreme Court has equated the payment of compelled dues with membership in the labor organization:

> Under the second proviso to § 8(a)(3) [of the Wagner Act & reaffirmed under the Taft-Hartley amendments], the burdens of membership upon which employment may be conditioned are expressly limited to the payment of initiation fees and monthly dues. It is permissible to condition employment upon membership, but membership, insofar as it has significance to employment rights, may in turn be conditioned only upon payment of fees and dues. "*Membership*" *as a condition of employment is whittled down to its financial core*. This Court has said as much before in *Radio Officers' Union v. Labor Board*, 347 U.S. 17, 41, 74 S. Ct. 323, 336, 98 L. Ed. 455 [(1954)] . . . .

*NLRB v. Gen. Motors Corp.*, 373 U.S. 734, 742, 83 S. Ct. 1453, 1459, 10 L. Ed. 2d 670 (1963) (emphasis added). *Accord Beck*, 487 U.S. at 745, 108 S. Ct. at 2648, 101 L. Ed. 2d 634 ("Taken as a whole, § 8(a)(3) permits an employer and a union to enter into an agreement requiring all employees to become union members as a condition of continued employment, but the 'membership' that may be so required has been 'whittled down to its financial core.' *NLRB v. General Motors Corp.*, 373 U.S. 734, 742, 83 S. Ct. 1453, 1459, 10 L. Ed. 2d 670 (1963). The statutory question presented in this case, then, is whether this 'financial core' includes the obligation to support union activities beyond those germane to collective bargaining, contract administration, and grievance adjustment. We think it does not." (footnote omitted)).

infringe the right[.]" *Regan v. Tax'n With Representation of Wash.*, 461 U.S. at 549, 103 S. Ct. at 2003, 76 L. Ed. 2d 129. Thus, "although government may not place obstacles in the path of a [person's] exercise of . . . freedom of [association], . . . the Constitution does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom." *Id.* at 549-50, 103 S. Ct. at 2003, 76 L. Ed. 2d 129 (quotations and citations omitted). In other words, "unions have no constitutional entitlement to the fees of nonmember-employees." *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185, 127 S. Ct. 2372, 2379, 168 L. Ed. 2d 71 (2007).[66]

It is also noteworthy that the Supreme Court has "never suggested that the First Amendment is implicated whenever governments place limitations on a union's entitlement to [compelled dues] above and beyond [restricting the use of those compelled dues to expenses germane to collective bargaining]." *Davenport*, 551 U.S. at 185, 127 S. Ct. at 2379, 168 L. Ed. 2d 71. In fact, the Court has found this restriction to be "a *minimum* set of procedures." *Id.* The Court has clarified that "[t]he constitutional floor for unions' collection and spending of [compelled dues] is not also a constitutional ceiling for state-imposed restrictions." *Id.* Thus, the Labor Unions' argument that the Act's ban on compelled dues goes too far because workers' rights already are protected by restrictions on the expenditures for which those funds may be used is unsound. Clearly a state may

---

[66] The Labor Unions assert that they do not claim any constitutional entitlement to the fees, *i.e.*, compelled dues, of nonmember employees. We disagree. By claiming that the denial of compelled dues violates their association rights, the Labor Unions necessarily claim they are constitutionally entitled to those dues.

43

enact legislation that provides greater protections to its workers without offending constitutional rights. Indeed, the fact that "*courts* have an obligation to interfere with a union's statutory entitlement no more than is necessary to vindicate the rights of nonmembers *does not imply that legislatures (or voters) themselves cannot limit the scope of that entitlement.*" *Id.* at 186, 127 S. Ct. at 2379, 168 L. Ed. 2d 71 (emphasis added). The *Davenport* Court even went so far as to acknowledge that "it would be constitutional for Washington to eliminate [compelled dues] entirely." *Id.* at 184, 127 S. Ct. at 2378, 168 L. Ed. 2d 71. To the extent that the prohibition of compelled dues may make it more difficult for labor organizations to recruit members, it does not thereby violate any right of association that they may be guaranteed.[67]

Finally, we note that, after this Court handed down the decision in *Morrisey I*, the United States Supreme Court changed its position on the propriety of agency-shop agreements and their associated compelled dues. In *Janus v. American Federation of State, County and Municipal Employees, Council 31*, ___ U.S. ___, 138 S. Ct. 2448, 201

---

[67] *Cf. Smith v. Ark. State Highway Emp., Local 1315*, 441 U.S. 463, 465-66, 99 S. Ct. 1826, 1828, 60 L. Ed. 2d 360 (1979) (finding state action that impaired or undermined the effectiveness of the union, but was "[f]ar from taking steps to prohibit or discourage union membership or association," was not an impairment that the Constitution prohibited); *S.C. Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1256 (4th Cir. 1989) (finding, with respect to the legislative denial of payroll deductions for payment of labor organization dues, that "[a]lthough loss of payroll deductions may economically burden the [labor organization] and thereby impair its effectiveness, such a burden is not constitutionally impermissible," and observing that the subject "legislation does not prohibit, regulate, or restrict the right of the [labor organization] or any other organization to associate, to solicit members, to express its views, to publish or disseminate material, to engage in political activities, or to affiliate or cooperate with other groups").

L. Ed. 2d 924 (2018), the Supreme Court issued an opinion finding an Illinois statute that authorized public-sector unions to assess compelled dues was unconstitutional. In doing so, the *Janus* Court overruled its prior holding in *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S. Ct. 1782, 52 L. Ed. 2d 261 (1977), which had upheld the constitutionality of an agency-shop arrangement. Rejecting the *Abood* decision as inadequately reasoned and an anomaly, the *Janus* Court found that the Illinois statute violated "the free speech rights of nonmembers by compelling them to subsidize private speech on matters of substantial public concern." *Janus* at ___, 138 S. Ct. at 2460, 201 L. Ed. 2d 924. Although *Janus* did not analyze the impact striking down the statute had on a labor organization's claim of association rights, it nevertheless provides powerful support for statutes that bar the collection of compelled dues. By striking down the Illinois compelled dues statute, the Court highlighted the importance of protecting the rights of workers to be free from financially supporting labor organizations whose views they do not share. The fact that forcing private workers to subsidize a labor organization may not implicate matters of substantial public concern at the same level as the public workers at issue in *Janus*, we find this distinction of no moment. "Simply put, [t]he differences between public- and private-sector collective bargaining do not translate into differences in First Amendment rights." *Robinson v. State of N.J.*, 741 F.2d 598, 606 (3d Cir. 1984) (quotations and citations omitted). Workers in the private sector have no less of a right than public sector employees to be free from forced association with a labor organization. "There is no doubt that union workers enjoy valuable rights of association and assembly that are protected by the First

45

Amendment. . . . But . . . that right alone cannot operate as an offensive weapon to wrest rights from others." *Sweeney v. Pence*, 767 F.3d 654, 670 (7th Cir. 2014).

For the foregoing reasons, we now hold that the provisions of West Virginia Code sections 21-1A-3 (2019) and 21-5G-2 (2019) that prohibit requiring a person, as a condition of employment or as a condition for the continuation of employment, to pay any dues, fees, assessments, or other similar charges to a labor organization do not violate any right of association under article III, sections 7 and 16 of the West Virginia Constitution.

### B.  Property Rights

Our analysis of the circuit court's ruling on the Labor Unions' property rights involves the Takings Clause of the West Virginia Constitution and is divided into three sections. We first review the particular constitutional provision at issue. We then summarize the challenged circuit court ruling and the arguments presented by the parties. Finally, we analyze the issue presented and provide our conclusion.

**1. Takings governed by article III, section 9 of the West Virginia Constitution.** Article III, section 9 of the West Virginia Constitution, also known as the Takings Clause, states:

> Private property shall not be taken or damaged for public use, without just compensation; nor shall the same be taken by any company, incorporated for the purposes of internal improvement, until just compensation shall have been paid, or secured to be paid, to the owner; and when private

46

property shall be taken, or damaged for public use, or for the use of such corporation, the compensation to the owner shall be ascertained in such manner as may be prescribed by general law: *Provided*, That when required by either of the parties, such compensation shall be ascertained by an impartial jury of twelve freeholders.

It has been recognized that "[t]his provision of our Constitution [is a] limitation[] upon the authority of the sovereignty to take private property for public use." *Bd. of Ed. of Kanawha Cty. v. Campbells Creek R. Co.*, 138 W. Va. 473, 476, 76 S.E.2d 271, 273 (1953). Furthermore, "[u]nder our Constitution, private property cannot be taken for private use, either with or without compensation." Syl. pt. 1, *Hench v. Pritt*, 62 W. Va. 270, 57 S.E. 808 (1907).

We have explained that "[a] 'property interest' includes not only the traditional notions of real and personal property, but also extends to those benefits to which an individual may be deemed to have a legitimate claim of entitlement under existing rules or understandings." Syl. pt. 3, *Waite v. Civil Serv. Comm'n*, 161 W. Va. 154, 241 S.E.2d 164 (1977), *overruled on other grounds by W. Va. Dep't of Educ. v. McGraw*, 239 W. Va. 192, 800 S.E.2d 230 (2017).[68]  We also have clarified that services rendered are property capable of being taken by the State.[69]  Because services rendered are a classification of

---

[68] *Accord Morrisey I*, 239 W. Va. at 641, 804 S.E.2d at 891.

[69] *See, e.g.*, *Jewell v. Maynard*, 181 W. Va. 571, 581, 383 S.E.2d 536, 546 (1989) (rejecting "proposition that requiring lawyers to accept appointments involuntarily, even for no pay at all, is an unconstitutional taking," but holding at Syllabus point 3 that "[i]t is an unconstitutional taking of property without just compensation to require a lawyer

47

property capable of being taken, we consider whether or not the prohibition of compelled dues contained in the Act, and the companion provision set out in the West Virginia Labor Management Relations Act, authorize an unconstitutional taking of services rendered by the Labor Unions. We begin by summarizing the circuit court's ruling and the arguments of the parties.

**2. Circuit court's ruling and the parties' arguments related to the Takings Clause.** The circuit court found that, because the Labor Unions have been designated as exclusive bargaining representatives, they have a mandatory obligation under the LMRA to represent all employees in their respective bargaining units, regardless of whether or not the employees have joined, or pay any form of dues to, the Labor Unions. The circuit court observed that there are various expenses borne by labor organizations in relation to their collective bargaining activities. Such expenses include, for example, the costs of negotiating and administering contracts, maintaining office space, and paying staff. The circuit court reasoned that, because of the mandatory duty imposed by federal law upon exclusive bargaining representatives such as the Labor Unions to represent all members of a bargaining unit, West Virginia law preventing the Labor Unions from collecting compelled dues from the nonmember beneficiaries of their collective bargaining efforts to compensate them for the cost of those efforts amounts to an unconstitutional taking by the State of West Virginia.

to devote more than ten percent of his or her normal work year involuntarily to court appointed cases").

48

The State argues that the Act does not take or infringe upon any cognizable property interest; thus, the circuit court erred in finding that the Act violates West Virginia's Takings Clause. Because the Act operates prospectively only and has no effect on existing contracts, the State believes the Labor Unions are actually attempting to claim the taking of a unilateral expectation of future dues, which is not a cognizable property interest that is protected by the Takings Clause. In addition, the State points out that the obligation to represent all members of a bargaining unit derives from federal law; therefore, any taking is imposed by federal law and not the Act. Finally, the State observes that labor organizations make a voluntary choice to become an exclusive representative, it is not forced on them, and the choice is accompanied by valuable benefits that effectively compensate them for their obligation to represent everyone in the collective bargaining unit. In other words, labor organizations are not compelled to provide collective bargaining services to nonmembers; rather, it is their choice, and they receive compensation for that choice.

The Labor Unions reiterate that it costs money to negotiate and administer labor contracts, and labor organizations bear other necessary expenses to operate. According to the Labor Unions, the funds used to pay for these various expenses come, almost entirely, from the dues collected. They complain that prohibiting them from collecting appropriate fees from nonmembers takes money from the union and essentially gives it to those nonmembers in violation of article III, section 9 of the West Virginia Constitution. In response to the State's argument that labor organizations are compensated

49

for becoming exclusive representatives by virtue of the benefits they receive from that designation, the Labor Unions contend that any benefits they receive are not reducible to a calculable amount, and are offset by the constraints and duties imposed upon them by the LMRA.

**3. Analysis.** It is important to understand at the outset that the Act's application is prospective only. It has no effect on any existing contracts that allow for compelled dues. In *Morrisey I*, we recognized that "'[a] "property" interest protected by due process must derive from private contract or state law, and must be more than [a] unilateral expectation . . . .'" 239 W. Va. at 641, 804 S.E.2d at 891 (quoting Syl. pt. 3, in part, *Orteza v. Monongalia Cty. Gen. Hosp.*, 173 W. Va. 461, 318 S.E.2d 40 (1984)). As we explained in *Morrisey I*:

> These due process guides are instructive in the context of the alleged taking of a property interest. In the absence of a collective bargaining agreement, unions have only a "unilateral expectation" of receiving fees from nonunion employees. Prior to the passage of Senate Bill 1 [the Act] unions could only speculate whether they would be able to negotiate new agreements with employers that would require the collection of fees from nonunion employees. The formation of a collective bargaining agreement with a fee-collection provision was contingent upon the consent of a third party: the employer. Hence, in the absence of an actual collective bargaining agreement, the unions have only a unilateral expectation that they will receive fees from nonunion employees. Senate Bill 1 [the Act] does not affect existing contracts; it affects only future agreements that unions and employers have not yet negotiated or accepted. The unions therefore have no protected property right that the Legislature has taken through the adoption of Senate Bill 1 [the Act].

50

239 W. Va. at 641-42, 804 S.E.2d at 891-92.[70]

In addition, we find, as have other courts addressing a takings argument arising from a right-to-work law, that the Act itself simply does not effect a taking because the Act does not impose a duty upon labor organizations to provide services to noncontributing employees. Instead, the obligation of an exclusive representative labor organization to provide representation to all members of the collective bargaining unit derives from federal law.[71] For example, when the United States Court of Appeals for the Seventh Circuit addressed this issue, it found that

---

[70] *See also Int'l Ass'n of Machinists Dist. 10 & Its Local Lodge 1061 v. State*, 903 N.W.2d 141, 149 (Wis. Ct. App. 2017) (finding no taking, in part, because Wisconsin's right-to-work law, Act 1, "does not appropriate, transfer, or encumber money contained in the Unions' treasuries" (quotations and citation omitted)).

[71] *See* 29 U.S.C. § 159(a) (empowering an exclusive bargaining representative to bargain with the employer on behalf of all employees in a bargaining unit and imposing a corresponding duty to provide representation to all of the bargaining unit's employees). We acknowledge that the West Virginia Code also contains a provision that requires an exclusive representative to collectively bargain on behalf of all employees in a unit with respect to certain aspects of their employment. *See* W. Va. Code § 21-1A-5 (LexisNexis 2019) ("Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining with respect to rates of pay, wages, hours of employment or other conditions of employment."). However, this provision merely incorporates federal requirements in an area that has been preempted by federal law; therefore, this state statute does not change the fact that the fair representation obligation is imposed by federal law. *See Richardson v. United Steelworkers of Am.*, 864 F.2d 1162, 1166-67 (5th Cir. 1989) (observing that the "federal duty of fair representation [has] preempted state substantive law" (citing *Vaca v. Sipes*, 386 U.S. 171, 87 S. Ct. 903, 17 L. Ed. 2d 842 (1967))); *E.E.O.C. v. Int'l Bhd. of Elec. Workers Local Union 998*, 343 F. Supp. 2d 655, 659 (N.D. Ohio 2004) ("The duty of fair representation encompasses an area of labor law which has been

51

> [t]he Union's alleged deprivation is the product of federal law and the Indiana statute operating in tandem. Because it is federal law that provides a duty of fair representation, Indiana's right-to-work statute does not "take" property from the Union—it merely precludes the Union from collecting fees designed to cover the costs of performing the duty. Even supposing the Union could justify its suit by invoking something like the tort doctrine of "concurrent actual causes," the dissent has not explained why the proper remedy would be to strike down Indiana's right-to-work statute rather than striking down or modifying the federal law imposing on all unions the duty of fair representation, in right-to-work states and non-right-to-work states alike.

*Sweeney*, 767 F.3d at 666.[72]

An additional ground for rejecting the argument that right-to-work laws such as the Act unconstitutionally take property from labor organizations is the fact that labor

---

occupied so fully by Congress that it forecloses state regulation. *Maynard v. Revere Copper Prods., Inc*., 773 F.2d 733, 735 (6th Cir. 1985).").

[72] *See also Int'l Union of Operating Eng'rs Local 370 v. Wasden*, 217 F. Supp. 3d 1209, 1223 (D. Idaho 2016) (rejecting taking argument based on *Sweeney* analysis finding the "alleged deprivation is the product of federal law, which requires the duty of fair representation. 29 U.S.C. § 159(a)[,]" and further commenting that "the proper target for Local 370's challenge is the NLRA, which authorizes both the Union's exclusive representation and its concomitant duty of fair representation"); *Zoeller v. Sweeney*, 19 N.E.3d 749, 752 (Ind. 2014) (commenting that "[o]n the face of the Indiana Right to Work Law, there is no state demand for services; the law merely prohibits employers from requiring union membership or the payment of monies as a condition of employment," and concluding, "[b]ecause it is federal law that provides a duty of fair representation, Indiana's right-to-work statute does not 'take' property from the Union." (quotations and citation omitted)); *Int'l Ass'n of Machinists Dist. 10 & Its Local Lodge 1061*, 903 N.W.2d at 149 (concluding that Wisconsin's right-to-work law, Act 1, "does not require labor organizations to provide services to anyone. Act 1 merely prohibits employers from requiring union membership or the payment of fees as a condition of employment").

organizations actually do receive compensation for their duty to represent all employees in a bargaining unit. This reasoning has persuaded numerous courts, including the United States Supreme Court. The Supreme Court, in *Janus*, rejected the argument that the risk of members of the bargaining unit receiving the benefit of a union's collective bargaining efforts without contributing to the cost thereof provides justification for allowing such compelled dues.[73] The *Janus* Court reasoned that labor organizations that have been designated as an exclusive representative receive compensation for their representation of nonmembers in the form of the significant benefits they obtain by virtue of that designation, and recognized that the corresponding burden imposed on them by the obligation of fair representation is not heavy:

> Even without [compelled dues], designation as the exclusive representative confers many benefits. As noted, that status gives the union a privileged place in negotiations over wages, benefits, and working conditions. . . . Not only is the union given the exclusive right to speak for all the employees in collective bargaining, but the employer is required by state law to listen to and to bargain in good faith with only that union. . . .[74] Designation as exclusive representative thus

---

[73] The *Janus* Court observed the perspective of a bargaining unit member who does not wish to join a labor organization when it noted that the employee argued that "he is not a free rider on a bus headed for a destination that he wishes to reach but is more like a person shanghaied for an unwanted voyage." *Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, ___ U.S. ___, ___, 138 S. Ct. 2448, 2466, 201 L. Ed. 2d 924 (2018).

[74] *See* W. Va. Code § 21-1A-4(a)(5) (LexisNexis 2019) (declaring it an unfair labor practice for an employer to "refuse to bargain collectively with the representatives of his or her employees, subject to the provisions of subsection (a), section five [§ 21-1A-5(a)] of this article"). Indeed, the Labor Unions, in arguing in their appellate brief that they have no real choice but to seek designation as exclusive representatives, acknowledge the value of being certified as an exclusive representative: "If the union does not seek [National Labor Relations] Board certification [as an exclusive representative],

53

"results in a tremendous increase in the power" of the union. *American Communications Assn. v. Douds*, 339 U.S. 382, 401, 70 S. Ct. 674, 94 L. Ed. 925 (1950).

. . . .

These benefits greatly outweigh any extra burden imposed by the duty of providing fair representation for nonmembers.  What this duty entails, in simple terms, is an obligation not to act solely in the interests of [the union's] own members. . . .

*Janus*, ___ U.S. at ___, 138 S. Ct. at 2467, 201 L. Ed. 2d 924 (quotations and citations omitted).[75]

Directly addressing a takings challenge, the Seventh Circuit in *Sweeney* similarly concluded that "the union is justly compensated by federal law's grant to the Union the right to bargain exclusively with the employer.  The reason the Union must represent all employees is that the Union alone gets a seat at the negotiation table." *Sweeney*, 767 F.3d at 666.  The *Sweeney* Court explained its rationale by stating that

[t]he duty of fair representation is . . . a "corresponding duty" imposed in exchange for the powers granted to the Union as an exclusive representative. . . . It seems disingenuous not to recognize that the Union's position as a sole representative

---

but instead seeks to bargain collectively on behalf of only union members, then there is no duty on the employer to bargain with the union."

[75] The *Janus* Court explained that arguments directed at the burden on labor unions that cannot collect compelled dues "'are generally insufficient to overcome First Amendment objections.' *Knox*[ *v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 311, 132 S. Ct. 2277, 2289, 183 L. Ed. 2d 281 (2012)].  To hold otherwise across the board would have startling consequences." *Janus*, ___ U.S. at ___, 138 S. Ct. at 2466, 201 L. Ed. 2d 924.

comes with a set of powers and benefits as well as responsibilities and duties.

*Id.*[76] Likewise, the Wisconsin Court of Appeals has reasoned that

> the duty of fair representation is optional, carrying with it attendant benefits and costs. . . . The benefits received by the exclusive representative include being the sole seat at the bargaining table with the employer, as well as the power to negotiate collective bargaining agreements on behalf of all employees in the bargaining unit. *See Sweeney*, 767 F.3d at 666. These benefits correspond, however, to the duty to fairly represent all employees in the bargaining unit. *See Vaca*, 386 U.S. at 177, 87 S. Ct. 903; *Clark*, 8 Wis.2d at 272, 99 N.W.2d 132. Unions must now consider the foregoing costs and benefits in light of the additional requirements imposed by Act 1 [Wisconsin's right-to-work law], and then determine how best to lawfully acquire the funds they believe they need to perform their duties as an exclusive bargaining representative. Such a context in no manner accomplishes an unconstitutional taking of private property, including either the Unions' money or its services.

*Int'l Ass'n of Machinists Dist. 10 & Its Local Lodge 1061*, 903 N.W.2d at 150.

For the same reasons, the Supreme Court of Kentucky recently rejected the argument that the Kentucky right-to-work act effected a taking of labor organization property. Relying heavily on *Janus*, the Kentucky high court observed that the designation of exclusive representative

---

[76] The Sweeney court cited *Steele v. Louisville & Nashville Railroad Co.*, 323 U.S. 192, 202, 65 S. Ct. 226, 232, 89 L. Ed. 173 (1944), for the proposition that "[t]he powers of the bargaining representative are 'comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents.'" *Sweeney*, 767 F.3d at 666.

55

provides a union with a privileged place over wages, benefits, and working conditions. In the collective bargaining process, the union has the exclusive right to speak for all employees and an employer is required to listen to the union and negotiate in good faith. The designation results in a tremendous increase in power of the union. [*Janus*, ___ U.S. ___, 138 S. Ct. at 2467, 201 L. Ed. 2d 924 (citing *Am. Commc'n Ass'n v. Douds*, 339 U.S. 382, 401, 70 S. Ct. 674, 686, 94 L. Ed. 925 (1950))]. Second, the union is granted special privileges in obtaining information about employees and having fees and dues deducted directly from wages. *Id*. As noted by the Court, these benefits greatly outweigh any extra burden imposed by the duty of fair representation for nonmembers, and the duty of fair representation does not significantly increase expenses that the unions would otherwise bear in negotiating collective bargaining agreements. *Id*. at 2467-68. Pertinently, and as to representation of nonmembers in grievance proceedings, the Court stated "[u]nions do not undertake this activity solely for the benefit of nonmembers[.]" *Id*. at 2468.

*Zuckerman v. Bevin*, 565 S.W.3d 580, 602 (Ky. 2018).[77]

The fact that the duty of fair representation also includes an obligation to represent nonmembers in grievance proceedings also does not give rise to a taking. As the Court in *Janus* observed,

> [u]nions do not undertake this activity solely for the benefit of nonmembers. . . . Representation of nonmembers furthers the

---

[77] *See also Int'l Union of Operating Eng'rs Local 139 v. Schimel*, 863 F.3d 674 (7th Cir. 2017) (affirming district court's grant of motion for judgment on the pleadings that found, based upon *Sweeney* decision, that Wisconsin's right-to-work law, which prohibited payments to labor organization as condition of employment, did not constitute a taking); *Wasden*, 217 F. Supp. 3d at 1223 (finding that "even if Idaho's right-to-work law could be said to 'take' Local 370's 'property,' the union is justly compensated by federal law's grant to the Union the right to bargain exclusively with the employer. The reason the Union must represent all employees is that the Union alone gets a seat at the negotiation table." (internal quotations and citation omitted)).

union's interest in keeping control of the administration of the collective-bargaining agreement, since the resolution of one employee's grievance can affect others. And when a union controls the grievance process, it may, as a practical matter, effectively subordinate "the interests of [an] individual employee . . . to the collective interests of all employees in the bargaining unit." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 58, n.19, 94 S. Ct. 1011, 39 L. Ed. 2d 147 (1974) . . . .

*Janus*, ___ U.S. at ___, 138 S. Ct. at 2468, 201 L. Ed. 2d 924. In summary, the *Janus* Court concluded that compelled dues cannot

be justified on the ground that it would otherwise be unfair to require a union to bear the duty of fair representation. That duty is a necessary concomitant of the authority that a union seeks when it chooses to serve as the exclusive representative of all the employees in a unit. As explained, designating a union as the exclusive representative of nonmembers substantially restricts the nonmembers' rights. *Supra*, at [___, 138 S. Ct. at] 2460-2461, [201 L. Ed. 2d 924]. Protection of their interests is placed in the hands of the union, and if the union were free to disregard or even work against those interests, these employees would be wholly unprotected. That is why we said many years ago that serious "constitutional questions [would] arise" if the union were *not* subject to the duty to represent all employees fairly. [*Steele v. Louisville & Nashville R. Co.*, 323 U.S. 192, 198, 65 S. Ct. 226, 230, 89 L. Ed. 173 (1944)]. . . . We therefore hold that [compelled dues] cannot be upheld[.]

*Janus* at ___, 138 S. Ct. at 2469, 201 L. Ed. 2d 924.

Finally, in response to the State's argument that labor organizations have a choice not to become an exclusive representative and thus avoid the duty of fair representation, the Labor Unions contend that such a choice is merely illusory because employers have no duty to bargain with a members-only labor organization and would

57

invariably refuse to do so. Furthermore, the Labor Unions reason, if an employer did agree to negotiate with a members-only labor organization, the organization would have little to no leverage because the employer could walk away from the bargaining table at any point. We believe this argument merely serves to highlight the valuable benefits obtained by labor organizations who choose to seek the designation of exclusive representative. The fact that labor organizations do not like the choice presented to them under the law does not mean they are without a choice. The Supreme Court of Indiana was presented with a similar argument and also rejected it:

> The State further argues that, in any event, there is no demand for [fair representation] services at all because the Union can choose not to be an exclusive-agency union and become a members only union. The Union responds that "[c]hoosing to represent members-only bargaining units is not an option under the [National Labor Relations Act]" because the "[National Labor Relations Board] will not process a representation petition by a union seeking a members-only bargain unit" and "a union that proposes to represent a minority of the bargaining unit has no remedy if the employer refuses to bargain with it." . . . We disagree. The Union's federal obligation to represent all employees in a bargaining unit is optional; it occurs only when the union elects to be the exclusive bargaining agent, for which it is justly compensated by the right to bargain exclusively with the employer. *See* 29 U.S.C. § 158(a) ("It shall be an unfair labor practice for an employer . . . (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."); *Sweeney*, 767 F.3d at 666 ("The duty of fair representation is therefore a 'corresponding duty' imposed in exchange for the powers granted to the Union as to an exclusive representative.").

*Zoeller*, 19 N.E.3d at 753.[78]

Based upon the preceding discussion, we now hold that the provisions of West Virginia Code sections 21-1A-3 (2019) and 21-5G-2 (2019) that prohibit requiring a person, as a condition of employment or as a condition for the continuation of employment, to pay any dues, fees, assessments, or other similar charges to a labor organization do not result in an unconstitutional taking and do not violate article III, section 9 of the West Virginia Constitution.

### C. Liberty Interests

As with the previous issues we have addressed, we divide our discussion of whether the Act infringes on the liberty interests of labor organizations into three sections. We first review the constitutional provision at issue, then summarize the challenged circuit court ruling and the arguments presented. Finally, we analyze the issue presented and provide our conclusion.

**1. Liberty interest governed by article III, sections 3 and 10 of the West Virginia Constitution.** Pursuant to article III, section 3 of our Constitution:

> Government is instituted for the common benefit, protection and security of the people, nation or community. Of all its various forms that is the best, which is capable of

---

[78] *See also Zuckerman*, 565 S.W.3d at 602 (observing that "[n]o union is compelled to seek designation as exclusive representative, but such designation is avidly sought").

producing the greatest degree of happiness and safety, and is most effectually secured against the danger of maladministration; and when any government shall be found inadequate or contrary to these purposes, a majority of the community has an indubitable, inalienable, and indefeasible right to reform, alter or abolish it in such manner as shall be judged most conducive to the public weal.

Under article III, section 10 of our state constitution, "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers." We have said that "[t]he Due Process Clause, Article III, Section 10 of the West Virginia Constitution, requires procedural safeguards against state action which affects a liberty or property interest." Syl. pt. 3, *W. Va. Dep't of Educ. v. McGraw*, 239 W. Va. 192, 800 S.E.2d 230 (2017) (citation omitted).

With respect to the constitutionally protected liberty interest, this Court has explained that

[t]he "liberty interest" includes an individual's right to freely move about, live and work at his chosen vocation, without the burden of an unjustified label of infamy. A liberty interest is implicated when the State makes a charge against an individual that might seriously damage his standing and associations in his community or places a stigma or other disability on him that forecloses future employment opportunities.

Syl. pt. 4, *id.* (citation omitted). However, the Court has clarified that

liberty as used in the Constitution is not dwarfed into mere freedom from physical restraint of the person of the citizen, but is deemed to embrace the right of a man to be free in the employment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary

> for the common welfare. *It includes the right* to be free to use his faculties in all lawful ways; *to live and work where he will*.

*Ex parte Hudgins*, 86 W. Va. 526, 532, 103 S.E. 327, 330 (1920) (emphasis added).[79]

 

      **2. Summary of the circuit court's ruling and the parties' arguments.** The circuit court found that the Act infringes upon the liberty interests of labor organizations guaranteed by article III, sections 3 and 10 of the West Virginia Constitution. The circuit court reasoned that, "[i]n order for a statute to withstand constitutional scrutiny under the substantive due process standard, it must appear that the means chosen by the Legislature to achieve a proper legislative purpose bear a rational relationship to that purpose and are not arbitrary or discriminatory." *Thorne v. Roush*, 164 W. Va. 165, 168, 261 S.E.2d 72, 74 (1979). The circuit court then found that the Act is arbitrary insofar as it will require labor organizations and their officials "to work, to supply their valuable expertise, and to provide expensive services *for nothing.*" In reaching this conclusion, the circuit court identified two cases where this Court has invalidated laws that placed arbitrary conditions upon certain employment.[80]

---

      [79] These authorities refer to the liberty interest of an *individual*. The parties to this appeal have not provided any support for the proposition that a labor organization has a protected liberty interest under the West Virginia Constitution. Nevertheless, for the purposes of our discussion of this case, we will assume, without deciding, the existence of such a right.

      [80] *See Thorne*, 164 W. Va. 165, 261 S.E.2d 72 (striking a mandatory apprenticeship for barbers imposed by West Virginia Code section 30-27-3 as violating liberty interests); *Ex parte Hudgins*, 86 W. Va. 526, 103 S.E. 327 (invalidating a statute that made it a crime for "'any able bodied male resident of this state between the ages of sixteen and sixty, except bona fide students during school term,'" to "'fail or refuse to

61

The State argues that the circuit court erred in finding an infringement of constitutionally protected liberty interests.  The State also contends that there simply is no infringement insofar as the duty of fair representation arises under federal law, and even then only if a union makes a voluntary choice to organize as an exclusive agent as opposed to a members-only union.

The Labor Unions' brief does not provide a full response to this issue, but comments in a footnote by referring to its argument that any choice between organizing as an exclusive representative or member's-only union is illusory.

**3. Analysis.**  We agree with the State's position.  Unlike the *Thorne* and *Hudgins* cases relied upon by the circuit court, the Act itself does not impose any duty upon labor organizations to provide services to noncontributing employees.  Instead, that obligation arises under federal law.[81]

---

regularly and steadily engage for at least thirty-six hours per week in some lawful and recognized business, profession, occupation or employment'" (quoting section 2 of chapter 12 of the Acts 1917, Second Extraordinary Session)).

[81] *See* 29 U.S.C. § 159(a) (empowering an exclusive bargaining representative to bargain with the employer on behalf of all employees in a bargaining unit and imposing a corresponding duty to provide representation to all of the bargaining unit's employees).  *See, e.g.*, *Wasden*, 217 F. Supp. 3d at 1223 (acknowledging that federal law . . . requires the duty of fair representation.  29 U.S.C. § 159(a)"); *Sweeney*, 767 F.3d at 666 (noting that "*federal* law . . . provides a duty of fair representation"); *Zoeller*, 19 N.E.3d at 752 (commenting that "[o]n the face of the Indiana Right to Work Law, there is no *state* demand for services; the law merely prohibits employers from requiring union membership or the payment of monies as a condition of employment"); *Int'l Ass'n of Machinists Dist. 10 & Its Local Lodge 1061*, 903 N.W.2d at 149 (concluding that

Because the Act imposes no requirement that labor organizations provide collective bargaining related services to nonmembers, it does not infringe upon any liberty interest they may be guaranteed. Accordingly, we expressly hold that the provisions of West Virginia Code sections 21-1A-3 (2019) and 21-5G-2 (2019) that prohibit requiring a person, as a condition of employment or as a condition for the continuation of employment, to pay any dues, fees, assessments, or other similar charges to a labor organization do not infringe upon any liberty interest under article III, sections 3 and 10 of the West Virginia Constitution.

## IV.

## CONCLUSION

To summarize our analysis above, states are expressly authorized under federal law, the LMRA, to prohibit labor organizations from collecting compelled dues from workers as a condition of employment or as a condition for the continuation of employment. The West Virginia Legislature has exercised this authority by enactment of the Workplace Freedom Act with the clear legislative intent to protect the rights of West Virginia workers to choose for themselves whether to associate. From this basis, we have examined whether the Act violates the West Virginia Constitution's protections of association, property, and liberty rights, and have found no violations. The Act does not

Wisconsin's right-to-work law, Act 1, "does not require labor organizations to provide services to anyone. Act 1 merely prohibits employers from requiring union membership or the payment of fees as a condition of employment.").

63

violate association rights.  There simply is nothing in the Act that prevents workers from voluntarily associating with labor unions; instead, the Act operates to protect workers from being forced to associate with labor organizations they do not wish to join or fund.  The Act also does not take property.  The obligation on certain labor organizations to provide collective bargaining and grievance services to non-member workers is imposed by federal law, not the Act.  Furthermore, as we have explained above, labor unions that are obligated to provide this fair representation receive due compensation in the form of valuable benefits provided under federal law.  These benefits include their designation as the exclusive bargaining unit and the bargaining power that accompanies that designation.  For the same reason, the Act does not infringe on any liberty interest by prohibiting compelled dues. The obligation to provide services to nonmembers is imposed on labor organizations by federal law, not the Act, and they are compensated for those services.  In this appeal, Labor Unions have failed to present any relevant federal or state authority wherein a labor organization's rights have been infringed by right-to-work legislation similar to that enacted by our state legislature.  Moreover, the circuit court clearly erred in its application of this Court's holding in *Morrisey I*.  Because we have found the Act does not infringe upon association, property, or liberty rights protected by the West Virginia Constitution, we reverse the February 27, 2019 order of the Circuit Court of Kanawha County insofar as it granted partial summary judgment in favor of the Labor Unions.  As there remains no

64

genuine issue of fact to be tried and the law has been clarified, we remand this matter for entry of summary judgment in favor of the State.[82]

Reversed and remanded.

---

[82] As we previously noted, in its order of February 27, 2019, the Circuit Court of Kanawha County also granted partial summary judgment in favor of the State, and the Labor Unions did not appeal that ruling. *See supra* note 38. Thus, as a result of our disposition of this appeal, summary judgment shall now be granted to the State with respect to this case in its entirety.